STATE OF NEBRASKA, APPELLEE, V. MARVIN DYER, APPELLANT.
513 N.W.2d 316

Filed March 18, 1994.    No. S-93-316.

Joy Shiffermiller, of Ruff, Nisley & Lindemeier, for appellant.

Don Stenberg, Attorney General, and Delores Coe-Barbee for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ., and GRANT, J., Retired.

HASTINGS, C.J.

Defendant, Marvin Dyer, was charged with two counts of third degree assault, one involving his wife, Linda, and the other involving police officer Jim Olson. He was convicted of both counts by a jury in the county court for Box Butte County. The convictions were affirmed on appeal to the district court for Box Butte County. On appeal, he asserts that the county court erred in (1) overruling his motion to suppress, because he was subject to custodial interrogation without having been advised of his *Miranda* rights; (2) overruling his motion for discharge, because he was denied his right to speedy trial

contrary to statute and the federal and state Constitutions; (3) overruling his objection to the testimony of Dr. John J. Ruffing, Jr., on the basis of privilege, hearsay, and his constitutional right to confrontation of witnesses; (4) overruling his objections to the testimony of the ambulance drivers on the basis of privilege and the right of confrontation; (5) limiting his cross-examination of witnesses, police officers Gene Sheldon and Olson, by not allowing questions about the fact that a civil rights lawsuit is pending against them and the village of Hemingford, seeking monetary damages, in which Marvin is the plaintiff, which substantially bears on the officers' credibility as witnesses against Marvin; (6) overruling his motion to dismiss at the close of the State's case for failing to prove a prima facie case; (7) overruling his motion to dismiss at the end of all the evidence for lack of sufficient evidence to convict; and (8) entering a conviction against him, since there was insufficient evidence for the jury to convict.

A trial court's ruling on a motion to suppress is to be upheld on appeal unless its findings of fact are clearly erroneous. In determining whether a trial court's findings on a motion to suppress are clearly erroneous, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *State v. Ranson, ante* p. 71, 511 N.W.2d 97 (1994); *State v. DeGroat*, 244 Neb. 764, 508 N.W.2d 861 (1993).

In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. *State v. Hirsch, ante* p. 31, 511 N.W.2d 69 (1994); *State v. Wegener*, 239 Neb. 946, 479 N.W.2d 783 (1992).

A directed verdict is proper only where reasonable minds cannot differ and can draw but one conclusion from the evidence, where an issue should be decided as a matter of law. *State v. Hirsch, supra*; *Vredeveld v. Clark*, 244 Neb. 46, 504 N.W.2d 292 (1993).

A verdict in a criminal case must be sustained if the evidence,

viewed and construed most favorably to the State, is sufficient to support that verdict. Moreover, on such a claim, an appellate court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. Only where evidence lacks sufficient probative force as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. *State v. Cook*, 244 Neb. 751, 509 N.W.2d 200 (1993); *State v. Thompson*, 244 Neb. 375, 507 N.W.2d 253 (1993).

Shortly after midnight on August 7, 1991, Hemingford police officer Gene Sheldon was dispatched to the residence of Marvin and Linda Dyer on an emergency call. Linda was reportedly suffering from a pleurisy attack. Officer Sheldon arrived at approximately the same time as an ambulance. He followed the ambulance crew into the house and found Linda seated on the floor of the bathroom. Emergency medical technicians convinced her to leave the house to seek medical attention.

Officer Sheldon remained at the residence to try to determine if a crime had been committed. According to Officer Sheldon, Marvin said that he had hit his wife. Officer Sheldon remained at the house for approximately 2 hours. The officer stated that he was concerned about the children in the home and that he asked a volunteer firefighter to stay with them. He further stated that Marvin was not under arrest during this period of time. Linda returned to the house in the ambulance at about 1:45 a.m. Marvin went outside, at which time Officer Sheldon called another officer for assistance. Officer Sheldon asked Marvin if there was some place where he could spend the night, and Marvin replied that there was not. When Officer Jim Olson arrived, Officer Sheldon told Marvin that he was under arrest. Officer Olson testified that when he tried to place handcuffs on Marvin, Marvin struck Officer Olson's left temple with his right fist. Officer Olson stated that "we had kind of a wrestling match" and that they fell to the ground. Marvin was then handcuffed. Marvin testified that he told the officers that he could not walk. He also stated that he told the officers that his legs, shoulders, and back hurt while he was being dragged to the police car. Marvin suffered fractured vertebrae and required

two surgeries after the incident that night. At trial, defense counsel was not permitted to inquire about a civil lawsuit filed against the police officers involved in the arrest.

As his first assignment of error, Marvin asserts that the trial court erred in overruling his motion to suppress, arguing that a statement was made to Officer Sheldon during the course of custodial interrogation. Although the statement was made to Officer Sheldon while Marvin was inside his home and prior to his formal arrest, Marvin contends that the evidence shows that he was questioned while "deprived of his freedom of action in a significant way," contrary to *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), which states:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

At the suppression hearing, Officer Sheldon stated that he went to the Dyer residence on August 7, 1991, in connection with an emergency call for assistance made to the Hemingford rescue unit. After he arrived, he remained at the residence because he was concerned about the children and wanted to try to determine if a crime had been committed. Officer Sheldon stated that he asked Marvin if he had hit Linda and that Marvin stated that he had hit her. Marvin was therefore interrogated within the meaning of *Miranda*. See *Rhode Island v. Innis*, 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980) (interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from suspect). However, the more difficult question is whether Marvin was in custody for the purposes of *Miranda*.

Determinations as to whether a person has been seized, in the constitutional sense, are questions of fact. *State v. Bowersmith*, 224 Neb. 6, 395 N.W.2d 527 (1986); *State v. LaChappell*, 222 Neb. 112, 382 N.W.2d 343 (1986). But see *U.S. v. Griffin*, 922

F.2d 1343, 1347 (8th Cir. 1990) ("[c]ustody determinations are obviously mixed questions of law and fact which require that the entire circumstances of the particular case be carefully assessed").

In *Griffin*, the U.S. Court of Appeals for the Eighth Circuit found that factors previously deemed to be relevant to a determination of custody included the suspect's freedom to leave the scene, and the purpose, place, and length of the interrogation. However, the court noted that "[w]hile the accused's freedom of action during the interrogation remains a critical factor, the purpose, place and length factors have been interpreted to have inconclusive, independent relevance to the determination of custody." 922 F.2d at 1348. As to purpose, the court found: "[T]he fact that the purpose of the questioning is to further focus the investigation on the defendant 'does not weigh heavily in [the] analysis.' " *Id.*, quoting *U.S. v. Carter*, 884 F.2d 368 (8th Cir. 1989). The court further noted that while *Miranda* focused on the coercive aspects of station house interrogation, subsequent cases indicated that significant deprivations of freedom may occur elsewhere. See, e.g., *Orozco v. Texas*, 394 U.S. 324, 325, 89 S. Ct. 1095, 22 L. Ed. 2d 311 (1969) (suspect questioned in home, but not "free to go," was in custody). The *Griffin* court also found that length of interrogation was not a determinative factor in the custody analysis, noting that custody had been found in relatively brief interrogations.

Other indicia of custody were found in *Griffin* to be
>  (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the

questioning.

922 F.2d at 1349. The court found these indicia to be influential in a totality of the circumstances assessment, noting that

> [t]he first three of these factors may be fairly characterized as mitigating factors, that is to say the affirmative presence of one or more of these factors during questioning would tend to mitigate the existence of custody at the time of the questioning. Conversely, the remaining three factors may be characterized as coercive factors, which is to say that the affirmative presence of one or more of these factors during questioning would tend to aggravate the existence of custody.

*Id.*

We note that in the instant case, Officer Sheldon testified that when he first spoke to Marvin, he was trying to ascertain what had happened. Officer Sheldon stated that his purpose in remaining in the home for almost 2 hours was concern for the children, but admitted that he was there to learn if a crime had been committed. Officer Sheldon stated that he could not recall if Marvin ever asked him to leave.

Officer Sheldon also stated that he did not question Marvin during the first half hour he was there, but waited until the rescue unit had left with Linda to take her to the clinic. Officer Sheldon testified that he did not read Marvin his rights before they started talking. It is not clear at what point Officer Sheldon asked Marvin if he had hit Linda. Officer Sheldon was asked:

> Q- Do you recall anything else that he said at that time? At the time you asked him what happened and he said he hit her, do you remember anything else he said?
>
> A- I had a little difficulty in the next hour and 30 minutes or so that I talked to him before we got information on Mrs. Dyer. I remember the order of things being said.

Although Officer Sheldon remained with Marvin in the home until Linda returned, he also asked a third person, Hemingford fire chief Jim Yardley, to stay and watch the children. Officer Sheldon testified that he was not sure how many children were present, but that there were "more than five." During the time that Marvin was being questioned by Officer Sheldon, Yardley

and the children were in a different room. Officer Sheldon stated that at some point Marvin "said something to the effect that he wanted to go to bed and if anybody came back to the bedroom all they was going to hear was a loud bang. I took that to mean that he had a gun back there and might shoot." Officer Sheldon stopped Marvin from leaving by standing "in the hallway to prevent him from going down there and talked him into going and sitting down." Marvin was arrested after being questioned.

Applying the reasoning found in *U.S. v. Griffin*, 922 F.2d 1343 (8th Cir. 1990), to these facts, we note that apparently no "strong-arm" tactics were utilized during questioning. However, *Griffin* stated that "[a]n interrogation can still be custodial even though no strong-arm tactics are used . . . but the absence of such tactics is a factor which can assist us in reaching an objective conclusion that the suspect could not have associated the questioning with formal arrest." (Citation omitted.) 922 F.2d at 1351. But the remaining indicia, as applied to these facts, militate toward a finding of custody. Officer Sheldon clearly asserted control of the residence by remaining approximately 1½ hours after Linda was taken away, for a total of 2 hours at the Dyer residence. Although Marvin remained in the home, Officer Sheldon arranged for a third party to watch over the children. While Officer Sheldon stated that he could not recall if Marvin asked him to leave, he did state that Marvin was concerned that he would be arrested or asked to leave the house. Further, while Officer Sheldon testified that he asked Marvin if he had somewhere else that he could spend the night, Officer Sheldon admitted on cross-examination that he asked Marvin to leave only after Linda returned, at approximately 2:08 a.m. At 2:10 a.m., when Marvin wanted to go outside to sit in his car, he was arrested. The State argues that Marvin was restricted from going to his bedroom as a matter of personal safety. However, *Griffin* explains:

> Though it is often the case that suspects are escorted or chaperoned during questioning for reasons unrelated to custody, as in this case where Agent Waldie testified that he was concerned for the safety of himself and his partner,

"the relevant inquiry is the *effect on the suspect*" . . . . (Emphasis in original.) 922 F.2d at 1350, quoting *U.S. v. Carter*, 884 F.2d 368 (8th Cir. 1989). According to *Griffin*, the test for determining whether a suspect is in custody at a particular time is to "examine the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a 'reasonable person in the suspect's position would have understood his situation' to be one of custody." 922 F.2d at 1347. Under the totality of the circumstances, a reasonable person in Marvin's position could have understood his situation to be custodial. Although the State concedes that another court could apply the *Griffin* indicia of custody to the facts of this case and find custody, it argues that that is insufficient to find clear error on the part of the trial court. However, as noted in *Griffin*:

> The motivation and purpose of the *Miranda* opinion, as well as the ease of its application, are undermined if its effect is to simply substitute the endless chain of voluntariness questions that crowded court dockets prior to its announcement with a new class of case-by-case determinations on the issue of what is custody. . . .
>
> . . . We see no reason why doubts as to the presence or absence of custody should not be resolved in favor of providing criminal suspects with the simple expedient of *Miranda* warnings. As noted in the *Miranda* opinion, and as demonstrated by case law and legal authority appearing in the intervening years since the announcement of the *Miranda* decision, the effectiveness of law enforcement is not undermined by informing suspects of their rights.

922 F.2d at 1355-56.

We find that Marvin was in custody at the time of his interrogation. Therefore, the trial court erred in overruling his motion to suppress.

Marvin next asserts that the court erred in overruling his motion for discharge, alleging that he was denied his right to a speedy trial contrary to statute and the federal and state Constitutions.

Neb. Rev. Stat. § 29-1207 (Reissue 1989) provides that "[e]very person indicted or informed against for any offense

shall be brought to trial within six months." In computing the time for trial, certain periods are to be excluded, including periods of delay resulting from the absence or unavailability of the defendant, and the time from filing until final disposition of pretrial motions of the defendant. See § 29-1207(4).

Marvin contends that the record is "far from clear on the applicable dates which the state may argue should be excluded." Brief for appellant at 11. According to an order of the county court for Box Butte County on Marvin's motion for discharge for lack of speedy trial, case No. 91-520 was filed against him on August 9, 1991, and subsequently dismissed by the county attorney on December 16. The only specific allegation of error by Marvin refers to a time period between "August 15th through October 1991," when it is apparently unclear whether he willfully made himself unavailable. Brief for appellant at 12. Although Marvin refers to a "bond form" which shows that he was to appear on August 15, and a "return" made on October 1, these documents are missing from the record, as is the original information. Brief for appellant at 11. Thus, the only record available for our review is the county court's order which refers to dates pertinent to case No. 91-520, and the documents filed in relation to the case when it was refiled as case No. 92-155. It is incumbent upon the party appealing to present a record which supports the errors assigned; absent such a record, as a general rule, the decision of the lower court is to be affirmed. *Behm v. Northwestern Bell Tel. Co.*, 241 Neb. 838, 491 N.W.2d 334 (1992); *In re Interest of R.R.*, 239 Neb. 250, 475 N.W.2d 518 (1991).

In the absence of evidence in the record to support Marvin's claim that the county court erred in computing the relevant time periods for the purposes of the speedy trial act, the court's decision must be affirmed in regard to the initial case filed against him. A review of the computation made by the county court in connection with case No. 92-155 indicates that the court correctly excluded the time period between dismissal of case No. 91-520 and its refiling as case No. 92-155. While time chargeable against the State under the speedy trial act commences with the filing of an initial information against a defendant, the time chargeable to the State ceases, or is tolled,

during the interval between the State's dismissal of the initial information and refiling of an information charging the defendant with the same crime alleged in the previous, but dismissed, information. *State v. Trammell*, 240 Neb. 724, 484 N.W.2d 263 (1992); *State v. Sumstine*, 239 Neb. 707, 478 N.W.2d 240 (1991).

The county court also properly excluded the time periods of pending discovery motions and a pending motion to suppress. See, *State v. Classen*, 216 Neb. 323, 343 N.W.2d 749 (1984); § 29-1207(4). The court determined that the total time elapsed pursuant to the speedy trial right was 95 days, and properly denied Marvin's motion for discharge.

It is next asserted by Marvin that the trial court erred in overruling his objections to the testimony of a physician and ambulance attendants, who testified in regard to statements made by Linda. The State contends that the statements are admissible as exceptions to the hearsay rule under Neb. Rev. Stat. § 27-803 (Reissue 1989), which provides, in pertinent part:

Subject to the provisions of section 27-403, the following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(3) Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

Dr. John J. Ruffing, Jr., testified in regard to his August 7 emergency room examination of Linda. The record reflects that his testimony related generally to the nature of her injuries, including the fact that she had been subject to some "recent trauma." However, he was also asked over objection by Marvin:

Q- During the examination, did Linda Dyer tell you how those injuries had occurred?

A- No. When I asked her how they occurred, and I put this in quotes in my chart, - - -

. . . .

A- When I asked her how the altercation occurred she

answered, "I don't know. I don't know. It's been awhile. I don't know. It feels just like it is bruised. It's not broken. My left breast hurts a lot — a lot. My right arm hurts."

Dr. Ruffing's testimony in regard to how the "altercation" occurred relates more to fault than to what would be considered "reasonably pertinent to diagnosis or treatment." However, his testimony was inconclusive and did not assign fault to Marvin; thus, any error was harmless.

The State contends that statements made to ambulance attendants were also admissible under § 27-803(3). At the trial, Marvin objected to the admission of a statement made by Linda in the presence of Yardley, who was at the Dyer home on August 7 as a member of the Hemingford fire and rescue squad.

Yardley testified in regard to that statement:

Q- Okay. What do you mean by EMT?

A- Emergency medical technician.

Q- And what were you emergency medical technician personnel collectively doing with Linda in the kitchen of her home at that time?

A- We were trying to convince her to go with us to receive medical attention.

Q- Had you observed things about her that made you believe she needed medical attention that you could not give her in her kitchen?

A- Yes.

. . . .

Q- What did you hear [another EMT, Pat Moser] ask her?

. . . .

A- I don't remember the specific questions, but Pat was directing questions to her trying to get her to come with us to seek medical attention.

Q- But do you remember anything about what the questions were? Yes or no?

A- Not now.

Q- Okay. Do you remember what her response to the questions was? Yes or no?

A- Yes.

Q- Okay. What?

Over objection by Marvin, the answer given was, "She said, 'He beat me. Okay. He beat me.' "

This exchange was immediately followed by cross-examination, during which Yardley was asked, "Mr. Yardley, this was after EMT Moser had put quite a little pressure on her, correct?" to which Yardley responded, "Yes."

This testimony indicates that Linda's statement was made while she was being encouraged to *seek* medical treatment. However, it does not in any way indicate that she was being offered medical treatment, was receiving medical treatment, or was being diagnosed; thus, the testimony is inadmissible under § 27-803(3). Neither was it admissible under § 27-803(1). "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition," although hearsay, is admissible under the excited utterance exception to the hearsay rule. § 27-803(1).

In *State v. Tlamka*, 244 Neb. 670, 676, 508 N.W.2d 846, 850 (1993), we stated:

> " 'For a statement to qualify as an excited utterance, the following criteria must be established: (1) There must have been a startling event, (2) the statement must relate to the event, and (3) the statement must have been made by the declarant while under the stress of the event. . . . The key requirement is spontaneity, which "requires a showing the statements were made without time for conscious reflection." ' " *State v. Smith*, 241 Neb. 311, 316-17, 488 N.W.2d 33, 37 (1992) (quoting *In re Interest of D.P.Y. and J.L.Y.*, 239 Neb. 647, 477 N.W.2d 573 (1991)). See, also, 2 McCormick on Evidence § 272 (John W. Strong ed. 1992).

As may be noted above, Yardley's testimony does not adequately relate the condition of Linda or that her statement made was being made under stress caused by the event or the condition. Rather, it appears to be the result of pressure exerted on her; therefore the necessary element of spontaneity is absent and the testimony should have been excluded as inadmissible hearsay. See *State v. Martin*, 239 Neb. 339, 476 N.W.2d 536 (1991).

Marvin also contends that these statements were admitted in violation of the Confrontation Clause. However, having

determined that the evidence should have been excluded, we find it unnecessary for us to deal with this question.

It is next contended that the trial court should have allowed Marvin to inquire into his pending lawsuit against Officers Olson and Sheldon. Officer Olson was asked on cross-examination if he had been sued by Marvin, to which he answered, "Yes." However, the prosecution objected, and the court sustained the objection, instructing the jury not to consider any evidence on that issue. In regard to Officer Sheldon's testimony, the defense made the following offer of proof:

> [Defense counsel]: Your Honor, I would offer to prove — I don't — I don't think it is necessary that we call Officer Sheldon back in to do that. I would offer to prove that if I were to ask Officer Sheldon whether he has been sued as a result of this incident that he would answer yes, that he has. I think it goes toward his credibility as a witness as well as Officer Olson's credibility as a witness.
>
> THE COURT: Well, you are claiming more bias than credibility.
>
> [Defense counsel]: Well, bias is one measure of credibility.
>
> THE COURT: Right. That question, if asked of a jury [sic] and an objection was made, would be sustained and the jury would be told to disregard that question, so that would be the ruling of the Court. So you have preserved your record on that issue. But I believe — I am of the opinion that's not proper impeachment procedure.

We stated in *State v. Hartmann*, 239 Neb. 300, 310-11, 476 N.W.2d 209, 216 (1991):

> The right to cross-examine a prosecution witness regarding bias or motive is an important interest. "A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' . . .

We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 316-17, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974), citing 3A J. Wigmore, Evidence in Trials at Common Law § 940 (J. Chadbourn rev. 1970). In a more recent review of the confrontation clause, the U.S. Supreme Court wrote: "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' " *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986), quoting, in part, *Davis v. Alaska, supra*. "[T]he right to cross-examine includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable." *Pennsylvania v. Ritchie*, 480 U.S. 39, 51-52, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987). Thus, the denial of a criminal defendant's right to confront her or his accusers, and implicitly the right to cross-examination, see *Davis v. Alaska, supra*, is a violation of the defendant's constitutional rights. *State v. Warford* [223 Neb. 368, 389 N.W.2d 575 (1986)].

Thus, the trial court erred in refusing to allow Marvin to cross-examine Officers Olson and Sheldon in regard to possible bias. We noted in *Hartmann* that the improper denial of a defendant's opportunity to impeach a witness for bias was subject to harmless-error analysis and that where evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless.

In a jury trial of a criminal case, whether an error in admitting or excluding evidence reaches a constitutional dimension or not, an erroneous evidential ruling results in prejudice to a defendant unless the State demonstrates that the

error was harmless beyond a reasonable doubt. *State v. Hughes*, 244 Neb. 810, 510 N.W.2d 33 (1993); *State v. Toney*, 243 Neb. 237, 498 N.W.2d 544 (1993).

Because the State has failed to demonstrate that the error was harmless beyond a reasonable doubt, the failure of the trial court to allow Marvin to cross-examine Officers Olson and Sheldon in regard to the pending lawsuit was reversible error.

As his final assignment of error, Marvin contends that there was insufficient evidence for conviction.

A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict. Moreover, on such a claim, an appellate court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. Only where evidence lacks sufficient probative force as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. *State v. Cook*, 244 Neb. 751, 509 N.W.2d 200 (1993); *State v. Thompson*, 244 Neb. 375, 507 N.W.2d 253 (1993).

Although the evidence is in conflict, there is sufficient evidence to support Marvin's conviction as to the assault on Linda. Linda testified that during the incident of August 7, she hit her husband several times in the face, that he was trying to make her stop, and that he never once hit her. On direct examination she stated: "The last time that I hit Marvin, he had grabbed ahold of me and nailed me up against the bathroom closet and told me to stop it, to knock it off, settle down. It triggered. That was it. My pleurisy had hit it's [sic] point and I couldn't breathe." However, on cross-examination she admitted that she testified during a custody hearing that "[I] got shoved up against the bathroom shelving which knocked the wind out of me and my chest was hurting pretty bad."

As to the assault of Officer Olson, his supervisor at the time of the incident, Jay Smith, stated that Officer Olson had an injury to the left side of his face the next morning. However, Smith stated that he did not know how the injury occurred, except for what Officer Olson had told him. Although on remand Marvin should be permitted to question Officer Olson in regard to possible bias, Officer Olson did give direct

testimony that he was assaulted by Marvin.

Finally, we note that the bill of exceptions contains a statement by the prosecution to the effect that exculpatory evidence was being withheld from Marvin, although this was not assigned as error.

Ordinarily, to be considered by an appellate court, errors must be assigned and discussed in the brief of the one claiming that prejudicial error has occurred. *State v. Myers*, 244 Neb. 905, 510 N.W.2d 58 (1993); *State v. Vermuele*, 241 Neb. 923, 492 N.W.2d 24 (1992). However, we always reserve the right to note plain error which was not complained of at trial or on appeal but is plainly evident from the record, and which is of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *State v. Myers, supra*; *Design Data Corp. v. Maryland Cas. Co.*, 243 Neb. 945, 503 N.W.2d 552 (1993).

To put the statement in context, it is necessary to set out a portion of the colloquy between counsel and the court:

> [Defense counsel]: Yes, Your Honor. We made a motion for discovery early on in this case and one of the items that we asked for was any documents, papers, books, accounts, letters, photographs, objects or other tangible things which could be used as evidence. It has come to my attention that [the prosecutor] has some statements, and I am not even sure who they are of, but I believe they were taken by an insurance adjuster probably in connection with the civil case. He has got those and I think that those are witnesses that are being called or may be called in this action and I would submit that we are entitled to copies of those statements in our discovery motion.
>
> THE COURT: [Prosecutor]?
>
> . . . .
>
> [Prosecutor]: May it please the Court, she is absolutely right. *They contain exculpatory evidence and if I don't disclose it I am risking the State's case, but that is my decision to make, not hers.*

(Emphasis supplied.) The court denied Marvin's request.

In *State v. Phelps*, 241 Neb. 707, 730-31, 490 N.W.2d 676, 692, (1992), we stated:

The U.S. Constitution requires the State to disclose exculpatory material to an accused. *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), recognized that the suppression by the State of evidence favorable to and requested by an accused violates due process where the evidence is material to the guilt of the defendant. *State v. Meis* [217 Neb. 770, 351 N.W.2d 79 (1984)]. In *Moore v. Illinois*, 408 U.S. 786, 794-95, 92 S. Ct. 2562, 33 L. Ed. 2d 706 (1972), the U.S. Supreme Court explained that "[t]he heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence."

However, the State is not under a constitutional duty to disclose all information that might affect the jury's verdict. *United States v. Agurs*, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). Rather, a prosecutor has a duty to disclose all material exculpatory evidence. *Brady v. Maryland, supra.* As we said in *State v. Tweedy*, 224 Neb. 715, 718, 400 N.W.2d 865, 868 (1987), citing *State v. Rice*, 214 Neb. 518, 335 N.W.2d 269 (1983): "In order to be a material omission, the omitted proposed evidence must create a reasonable doubt as to the defendant's guilt that did not otherwise exist. That the evidence 'might' influence the outcome is insufficient."

The court having raised this question during argument, the State was granted leave to file a supplemental brief. In that brief, the State correctly asserts that "[t]he United States Constitution does not demand that a prosecutor allow complete discovery of his files to the defense." Additional brief for appellee at 5. As stated in *United States v. Bagley*, 473 U.S. 667, 675, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985):

The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to

ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.

However, here we are faced with a statement, on the record, that the prosecution is in possession of exculpatory evidence which it refuses to disclose. The State offers no rationale for the prosecutor's apparent belief that the documents at issue became work product when they came into his possession and were therefore not subject to Marvin's motion for discovery. See Neb. Rev. Stat. §§ 29-1912 and 29-1914 (Reissue 1989), which provide for the discovery procedures available to a defendant charged with a felony or a misdemeanor for which imprisonment is a possible penalty. The prosecutor also argued that it was not necessary to disclose evidence which could be used only for impeachment. However, the Supreme Court stated in *Bagley* that in both *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *United States v. Agurs*, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976),

the prosecutor failed to disclose exculpatory evidence. In the present case, the prosecutor failed to disclose evidence that the defense might have used to impeach the Government's witnesses by showing bias or interest. *Impeachment evidence, however, as well as exculpatory evidence, falls within the Brady rule.* See *Giglio* v. *United States*, 405 U. S. 150, 154[, 92 S. Ct. 763, 31 L. Ed. 2d 104] (1972). Such evidence is "evidence favorable to an accused," *Brady*, 373 U. S., at 87, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal.

(Emphasis supplied.) 473 U.S. at 676.

The only direct evidence of the assault on Officer Olson was his own testimony. Although we do not know the nature of the exculpatory evidence, there is a high probability that any exculpatory evidence would be material under these circumstances, and the trial court therefore erred in refusing to allow inspection of the statements.

The State contends that an error was made in the

transcription of the bill of exceptions, and offers the specious suggestion that the word "if" is missing preceding the word "they" in the phrase "they contain exculpatory evidence." Additional brief for appellee at 3. The State argues that the remarks of defense counsel and the court are inconsistent with an admission by the prosecutor that he was in possession of exculpatory evidence. However, adding the word "if" would not explain why the court would fail to review potentially exculpatory evidence. Furthermore, this court can decide only issues based on the record before it. *Raymond v. Department of Motor Vehicles*, 219 Neb. 821, 366 N.W.2d 758 (1985). See, also, *Wonderling v. Conley*, 182 Neb. 446, 155 N.W.2d 349 (1967) (the record of the trial court, when properly certified to an appellate court, imports absolute verity; if the record is incorrect, any correction must be made in the district court).

The proper procedure for amending a bill of exceptions is stated in Neb. Ct. R. of Prac. 5E (rev. 1992):

> Amendments to the Bill of Exceptions. The parties in the case may amend the bill of exceptions by written agreement to be attached to the bill of exceptions at any time *prior* to the time the case is submitted to the Supreme Court. Proposed amendments not agreed to by all the parties to the case shall be heard and decided by the district court after such notice as the court shall direct. The order of the district court thereon shall be attached to the bill of exceptions prior to the time the case is submitted to the Supreme Court. Hearings with respect to proposed amendments to a bill of exceptions may be held at chambers anywhere in the state. If the judge shall have ceased to hold office, or shall be prevented by disability from holding the hearing, or shall be absent from the state, such proposed amendments shall be heard by the successor judge, or by another district judge in the district, or by a district judge in an adjoining judicial district.

(Emphasis supplied.)

Rule 5C(4), regarding preparation and delivery of a bill of exceptions, states, in pertinent part:

> Upon receipt of the bill of exceptions, the clerk of the district court shall forthwith file it and notify all parties or

their attorneys of record and the Clerk of the Supreme Court of the date of such filing. *When filed with the clerk of the district court, such bill of exceptions becomes the official bill of exceptions* in the case and shall not be altered or marked in any fashion by any person.
(Emphasis supplied.)

Because of the various prejudicial errors detailed above, it is necessary that the judgment be reversed and the cause remanded to the district court with directions to remand it to the county court for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.