STATE OF NEBRASKA, APPELLEE, V. REED A. VEIMAN, APPELLANT.

546 N.W.2d 785

Filed April 19, 1996.   No. S-94-551.

I

Patrick J. Boylan, of Hascall, Jungers, Garvey & Delaney, for appellant.

Don Stenberg, Attorney General, and David T. Bydalek for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

WHITE, C.J.

This appeal from criminal convictions comes before this court on further review from the decision of the Nebraska Court of Appeals. *State v. Veiman*, 95 NCA No. 7, case No. A–94–551 (not designated for permanent publication). After a bench trial, the appellant, Reed A. Veiman, was found guilty of operating a motor vehicle while under the influence, leaving the scene of a property damage accident, and colliding with a fixed object. The district court affirmed, as did the Nebraska Court of Appeals. We reverse Veiman's convictions for operating a motor vehicle while under the influence of alcohol and leaving the scene of a property damage accident, and we affirm Veiman's conviction for colliding with a fixed object.

The appeal involves a one–car accident in the early morning hours of November 27, 1993. At about 2:30 a.m., Officer Billy Higgins of the Omaha Police Division was called to respond to a collision at the intersection of 42d and S Streets in Omaha.

On arrival, Higgins observed that a Ford Bronco had collided with a power pole; that the driver of the Bronco was not at the scene; that the Bronco was registered to two men by the name of Veiman; that the streets were slick and covered with snow; and that the collision had most likely occurred within the last hour, given the striations in the fresh snow and the damage to the Bronco. Higgins did not know which, if either, of the two men named "Veiman" had been driving the Bronco and saw no signs that the missing driver had been intoxicated. Higgins summoned a tow truck and remained at the accident scene until the tow truck arrived at 3:30 a.m. At that point, Higgins' involvement in the investigation ended.

Officer Brian Craig of the Omaha Police Division was notified by radio call that a tow truck en route from 42d and S Streets to its impound lot was being followed. The tow truck driver had surmised that the person following him might have been involved in the collision with the power pole. This radio call did not include a description of the car or a description of its occupants. At this time, Craig did not know whether the driver of the Bronco had been identified.

Craig proceeded to the impound lot, arriving at the same time that the tow truck arrived with the Ford Bronco. He did not speak with the tow–truck driver. Instead, he stopped a Ford Tempo on its way out of the impound lot to ask its driver whether he had been following the tow truck. At the time that Craig saw the Tempo, it was neither following the tow truck nor committing any traffic violations. Craig asked the driver of the car whether he had been following the tow truck; the driver, who was later identified as Veiman's father, answered that he had. Craig then asked Veiman's father, " 'Why? Is that your car?' " The passenger, Veiman, answered that the Bronco was his.

At trial, Craig testified to the following events:

Well, I went around to [Veiman's] side of the car and asked him if he'd been driving the car, and he said yes, and his father said that they needed to get to a hospital because he had a head injury. So I asked him what hospital they were going to go to, and he said he was going to take him all the way down to Midlands. So I said, "I've got to

investigate the accident. Why don't you just get in my car, and I'll take you up to Bergan–Mercy," which was extremely closer, and that way I could investigate the accident on the way, and he could get treatment a lot sooner than going all the way down south in Bellevue.

Veiman followed Craig's instructions. With regard to the circumstances under which Veiman and his father had tried to discontinue Craig's questioning and leave for the hospital of their choosing, Craig testified as follows under cross–examination:

Q– You said that when you did approach the car, that you spoke to two people inside, and one or both of them indicated to you that Reed Veiman was going to be taken to a hospital. Is that correct?

A– Correct. It was his father who ——

Q– Okay. His dad said that?

A– Yes.

Q– Okay. So then you offered to take him to a closer hospital?

A– A much closer hospital.

Q– Did you tell him he had to go with you, or did you offer that as a concern, or whatever?

A– Well, the way it was put to me by his father, was that he needed medical attention now. He was [i]n dire need. He could barely see out of one eye, as it was put to me.

. . . .

. . . So, since I have an accident to investigate, and if his son is in such poor medical shape — If I were to call an ambulance to take him, we'd have much more wasted time, and who knows what's going to happen to him. If I take him, if something happens to him while he's in my car, I have the ability to expedite.

. . . .

Q– And you say that Mr. Veiman . . . was not under arrest when you had him in this cruiser, taking him to the hospital?

A– No.

Q– Is that right?

A– That's correct.

Q– But I understand from what you're saying, that he wasn't free to go with his dad to a h[os]pital of his choice. Is that right?

A– For medical reasons, and since I have to investigate the hit and run, it was beyond my scope of reasoning why his dad, if his son is in such dire need of a doctor, why he would want to take him all the way to Midlands, which — correct me if I'm wrong — [i]s a much greater distance than to Bergan–Mercy, which was just up the street.

Q– That's your experience, as far as where those two hospitals are located.

A– Yes.

Q– So when he was in the car, you say he wasn't in custody, and you started to then question him about a traffic offense that had occurred, to your understanding, some time that morning at 42nd and "S" Street. Is that right?

A– Yeah. Maybe an hour or so before I got this call.

Q– Did you at any time advise him of his right to remain silent?

A– No.

Q– Did he have any warrants — Did you do any warrant check on him before he got in the cruiser with you to go to the hospital?

A– No. My main concern when he got in my car, was to get him to a hospital.

Q– But you also had a concern about a duty to investigate an accident scene?

A– That's secondary. I mean, I'm taking him to the hospital. I mean — he's not going to run off on me.

Craig also testified that he did not wait until arrival at the hospital to begin investigating the accident, but began questioning Veiman while en route from the impound lot to the hospital. Craig asked Veiman how the collision happened. As Veiman answered, Craig noticed that Veiman smelled like alcohol and that his speech was slurred; accordingly, Craig asked Veiman whether he had been drinking. According to Craig's testimony, this question was posed so Craig could both

ensure that Veiman's slurred speech was not caused by his injuries and investigate the collision. Veiman answered that he had had six or seven drinks prior to the collision. On the basis of this investigation, Craig cited Veiman for driving while intoxicated, leaving the scene of a property damage accident, and colliding with a fixed object.

Veiman moved to suppress his statements to Craig and any other evidence gleaned from the stop in the impound lot, claiming that Craig's questioning was prohibited by the Fifth Amendment and that the stop itself was not based on reasonable suspicion. The county court denied Veiman's motion. Veiman renewed the motion at trial; the county court affirmed its denial of the motion to suppress and subsequently found Veiman guilty as charged.

Unless clearly wrong, an appellate court will not overturn findings of fact made by a trial court on a motion to suppress. *State v. Dake*, 247 Neb. 579, 529 N.W.2d 46 (1995). In determining whether a trial court's findings on a motion to suppress are clearly erroneous, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration its observations of the witnesses. *State v. Grimes*, 246 Neb. 473, 519 N.W.2d 507 (1994).

Veiman assigns as error the county court's finding that no violation of Veiman's Fifth Amendment rights resulted when Craig questioned Veiman without the benefit of *Miranda* warnings. This assignment of error stems from holdings of both the U.S. Supreme Court and this court that in order to safeguard an uncounseled individual's Fifth Amendment privilege against self–incrimination, suspects interrogated while in police custody must be apprised of certain rights. See *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). See, also, *State v. Garza*, 241 Neb. 934, 492 N.W.2d 32 (1992). Specifically, suspects must be told that they have a right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation. *Thompson v. Keohane*, ____ U.S. ____, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995), citing *Miranda, supra*. See, also, *Garza,*

*supra*. *Miranda* warnings are due only when a suspect interrogated by the police is " 'in custody.' " 116 S. Ct. at 460.

The State does not argue with the fact that Craig failed to issue *Miranda* warnings, but insists instead that Craig was free to question Veiman as he pleased without the benefit of *Miranda* warnings because Veiman was not in custody. The State argues that Craig's questions to Veiman were merely "investigatory in nature" and that Craig was transporting Veiman to the hospital so he could investigate the collision involving Veiman's Bronco, as he was required to do. Brief for appellee at 10. The State further notes that Veiman was not under arrest at the time Craig was questioning him.

Whether the suspect is under formal arrest, however, is not dispositive; similarly, whether the officer claims that his questions were "investigatory in nature" is not dispositive. A suspect need not be handcuffed and locked in an interrogation room for custodial interrogation to occur, nor for the policies protected by *Miranda* to be jeopardized. Rather, what *is* dispositive in determining whether Craig should have issued *Miranda* warnings is whether a reasonable person would have felt free to leave under the circumstances then facing Veiman. See *Thompson, supra*. See, also, *State v. Brown*, 225 Neb. 418, 405 N.W.2d 600 (1987). The U.S. Supreme Court has defined "custodial interrogation" as " 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " 116 S. Ct. at 463. A person subjected to custodial interrogation is entitled to the benefit of *Miranda*'s procedural safeguards, regardless of the nature or severity of the offense of which he is suspected. *Berkemer v. McCarty*, 468 U.S. 420, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984).

Two discrete inquiries are essential to the determination of whether a suspect was in custody at the time of interrogation and thus entitled to *Miranda* warnings. The first inquiry is distinctly factual, requiring an assessment of the circumstances surrounding the interrogation. *Thompson, supra*. In this case, the circumstances included the following undisputed facts: Veiman and his father attempted to leave, stating that they were headed to a hospital; Craig stopped them from going to that

hospital (or anywhere else), instructing Veiman to get into the police cruiser so he could take Veiman to a hospital not of Veiman's choice and investigate the collision on the way; while Veiman sat in the police cruiser, Craig asked Veiman whether and how much he had been drinking, as well as other questions relating to the collision. To the extent that this determination would involve questions of credibility and demeanor, a reviewing court would accord more deference to the trial court's appraisal of the witnesses. *Thompson v. Keohane*, _____ U.S. _____, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995). In this case, because this inquiry yields undisputed facts, credibility is not an issue.

The second inquiry in the determination of whether a suspect is in custody is whether a reasonable person would have felt that he was not at liberty to terminate the interrogation and leave. *Id*. The U.S. Supreme Court found in *Thompson* that because the first inquiry establishes the historical facts of the interrogation and thus identifies the " 'totality of the circumstances,' " this second inquiry is an objective evaluation of those circumstances: if encountered by a reasonable person, would the identified circumstances add up to custody as defined by *Miranda*? 116 S. Ct. at 466. The objective evaluation enables reviewing courts to identify recurrent patterns and to advance uniform outcomes, such that both citizens and police are more attuned to the constitutional limits of fighting crime. *Id*.

In this case, the undisputed facts of Craig's investigation present circumstances wherein the reasonable person would consider himself to be in custody. For the State to argue that a reasonable person would have felt at liberty to leave defies reason; for the State to assert that a reasonable person would not define the circumstances of Craig's questioning as adding up to custody defies credibility. Craig affirmatively thwarted Veiman's first attempt to leave, ordered Veiman into his police cruiser, and began driving. The record does not state whether Veiman was in the back or the front seat of the cruiser; if he were in the back seat, Veiman could not have left because the rear doors of a police cruiser do not open from the inside. Even assuming that Craig allowed Veiman, whom Craig evidently

suspected of a crime, to ride "shotgun" in the front seat, Veiman could not have felt free to leave from a moving vehicle.

The fact that Craig couched his instruction to get into the police cruiser in the form of "*why don't you* just get in my car" does not make Veiman's entry of the police cruiser voluntary; the phrase "why don't you" does not make an instruction into a permissive invitation, particularly when spoken by a police officer in response to a request to discontinue questioning and leave. Were an officer to ask, "why don't you give me your license and registration," a reasonable person would not interpret those words as a choice between handing over those documents and keeping them in his possession. Similarly, "why don't you get out of the car" could not reasonably be construed as leaving the motorist the volition to say "no, thank you" in response. "Why don't you just get in my car, and I'll take you up to Bergan–Mercy," as delivered by Craig in response to the senior Veiman's attempt to discontinue Craig's questioning and leave for another hospital is not a permissive invitation. It is an instruction. No reasonable person would have felt free to leave under the circumstances of Veiman's case.

Against his expressed wishes, as stated by his father, Veiman was being transported to a hospital not of his choosing by a police officer who was asking him whether he had committed a crime within the last few hours. Craig testified that he fully intended to investigate the collision by questioning Veiman on the way to the hospital. Indeed, it takes some effort to reconcile Craig's concern for Veiman's health with his inability to wait to begin investigating until after Veiman's medical examination— or at least until after Craig had issued *Miranda* warnings. If Craig did not suspect Veiman of a crime, he could have taken Veiman's name and address and waited to question him until the next day. If Craig did suspect Veiman of a crime, he could and should have issued *Miranda* warnings. He knew that Veiman could not leave the police cruiser, and he knew that his questioning could lead to Veiman's self–incrimination. That Craig's investigation may have begun as a routine traffic stop is irrelevant in light of what the investigation later became. Whenever a motorist who has been detained pursuant to a traffic stop is subjected to treatment that renders him in custody,

he is entitled to the full panoply of *Miranda* protections. *Berkemer v. McCarty*, 468 U.S. 420, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984). There is no excuse for Craig's failure to issue *Miranda* warnings, nor is there any remedy except suppression of Veiman's statements.

In its brief, the State argues that Veiman volunteered the fact that he was the driver of the Bronco before he left his father's vehicle. The State does not explain the legal significance of this fact; if it is meant to support an argument that Veiman waived his rights, it fails in that regard. Veiman's admission, offered prior to Craig's instruction to get into the police cruiser, does not constitute the knowing, voluntary, and intelligent waiver of rights that the Fifth Amendment requires before an officer can subject a suspect to custodial interrogation. See *State v. Dean*, 246 Neb. 869, 523 N.W.2d 681 (1994), *cert. denied* ____ U.S. ____, 115 S. Ct. 2279, 132 L. Ed. 2d 282 (1995).

The admission that Veiman was the driver of the Bronco was significant only for the question of whether Veiman had collided with a fixed object in violation of Omaha Mun. Code, ch. 36, art. III, § 36–70 (1980), which prohibits approaching "a parked or stopped vehicle, or a fixed object in such a manner as to collide therewith." Veiman admitted to doing precisely what this ordinance prohibits, and he was in custody for *Miranda* purposes. We note that the validity of an ordinance that criminalizes a motor vehicle collision without regard to fault is suspect at best; Veiman did not question the ordinance's legitimacy, however, and we decline to raise the issue for him at this time.

The fact that every lower court to read this record has upheld Veiman's conviction for leaving the scene of a property damage accident necessitates this court's review under the plain error standard.

> Plain error exists where there is an error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.

*In re Estate of Morse*, 248 Neb. 896, 897, 540 N.W.2d 131, 132 (1995).

In Veiman's case, we find the plain error standard to be the appropriate means of addressing the finding of the Court of Appeals that "the driver of the Bronco had already committed a crime by leaving the scene of the accident" when Craig arrived at the impound lot. *State v. Veiman*, 95 NCA No. 7 at 72, case No. A-94-551 (not designated for permanent publication).

Craig issued Veiman a citation at 4:15 a.m. for leaving the scene of an accident and driving while intoxicated. What Craig knew at that time was that within the preceding 1 or 2 hours, Veiman had collided with a power pole in his Bronco, thus rendering the Bronco undriveable, and had left the scene before police arrived to investigate. These facts do not constitute a crime under Neb. Rev. Stat. § 39-6,104.02 (Reissue 1988) (now codified at Neb. Rev. Stat. § 60-696 (Cum. Supp. 1994)), the statute under whose auspices Veiman was charged with and convicted of leaving the scene of a property damage accident. Section 39-6,104.02 read as follows:

> The driver of any vehicle involved in an accident . . . upon a public highway . . . resulting in damage to property, shall (1) immediately stop such vehicle at the scene of such accident, and (2) give his name, address, and the registration number of his vehicle and exhibit his operator's . . . license to the owner of the property struck or the driver or occupants of any other vehicle involved in the collision. Any person violating this section shall, if he shall report such accident, by telephone or otherwise, to the appropriate peace officer within twelve hours, be guilty of a Class V misdemeanor or, if he does not report such accident within twelve hours, be guilty of a Class IV misdemeanor.

The provisions of § 39-6,104.02, applied to Veiman, made it impossible for Veiman to have violated that statute by the time of the investigative stop in the impound lot. The property with which Veiman collided was a power pole owned presumably by the city of Omaha, property which is most likely unattended at any hour of the day and certainly at 2:30 a.m., the estimated

time of the collision. Simply put, there was no property owner present to whom Veiman could have given his name and address at that time. By the terms of § 39-6,104.02, Veiman could not have violated the statute until 12 hours passed without Veiman taking steps to notify the city that he had struck its power pole.

That Craig was mistaken as to the terms of § 39-6,104.02 is immaterial, because ignorance of the law is no excuse. See, *State v. Wilson*, 194 Neb. 587, 234 N.W.2d 208 (1975); *Satterfield v. State*, 172 Neb. 275, 109 N.W.2d 415 (1961). If every criminal defendant, regardless of education or experience, is presumed to know the law, then certainly the same maxim must apply to police officers. The State cannot justify Craig's error of charging a nonexistent violation of § 39-6,104.02 by arguing that given another 10 hours, Veiman likely would have violated that law. Veiman's conviction for leaving the scene of an accident cannot stand.

We reverse Veiman's convictions for operating a motor vehicle while under the influence, in violation of Neb. Rev. Stat. § 39-669.07 (Cum. Supp. 1992) (now codified at Neb. Rev. Stat. § 60-6,196 (Reissue 1993)), and for leaving the scene of an accident, in violation of § 39-6,104.02. Since the evidence obtained by Craig as a result of the initial violation of Veiman's right against self-incrimination is inadmissible, the cause is remanded with directions to dismiss all charges except colliding with a fixed object. In view of this holding, we need not address Veiman's remaining assignments of error.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.

CONNOLLY, J., dissenting.

In its opinion, the majority concludes that Veiman was under custodial arrest at the time Officer Craig transported him to the hospital, and thus, "[t]here is no excuse for Craig's failure to issue *Miranda* warnings, nor is there any remedy except suppression of Veiman's statements." The majority characterizes the record as stating that Craig *instructed* and "*ordered*" Veiman into his police cruiser. However, this characterization is not supported by the record, which reflects that Veiman entered the cruiser voluntarily to be taken to the nearest hospital.

The majority correctly states our standard of review is that unless clearly wrong, this court will not overturn findings of fact made by a trial court on a motion to suppress. *State v. Dake*, 247 Neb. 579, 529 N.W.2d 46 (1995). In determining whether a trial court's findings on a motion to suppress are clearly erroneous, this court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *State v. Grimes*, 246 Neb. 473, 519 N.W.2d 507 (1994); *State v. Dyer*, 245 Neb. 385, 513 N.W.2d 316 (1994).

After observing the witnesses and weighing the evidence, the trial court denied Veiman's motion to suppress. I cannot go along with the majority's conclusion that this determination was clearly erroneous. I would therefore affirm.

WRIGHT and GERRARD, JJ., join in this dissent.

GERRARD, J., dissenting.

Although I join Justice Connolly's dissent, I write separately to address one further point in the majority opinion. I disagree with the majority's assertion that Veiman could not have violated the terms of Neb. Rev. Stat. § 39-6,104.02 (Reissue 1988), "until 12 hours passed without Veiman taking steps to notify the city that he had struck its power pole."

By its plain and unambiguous language, § 39-6,104.02 requires a motorist to do three things when he or she is involved in a property damage accident: (1) immediately stop at the scene of the accident; (2) give his or her name, address, and registration number to the property owner; and (3) show his or her operator's license to the owner of the property. Veiman theoretically complied with the first two provisions of § 39-6,104.02 when he left his Ford Bronco (with the registration certificate therein) unattended at the scene of the accident. However, Veiman did not show his operator's license to the owner of the property, nor did he make any effort to contact the owner of the property to exhibit his operator's license or identify himself in any manner prior to the time the police initiated contact at approximately 3:30 a.m. While the power pole may have been unattended at 2:30 a.m., it would not

have been difficult for Veiman to immediately contact either a peace officer or a representative of the city of Omaha in order to report the collision of his Bronco with the power pole. To simply leave the scene of a property damage accident without immediately attempting to contact the property owner or a peace officer violates both the letter of the law and the public policy underlying the statute.

Once Veiman left the scene of the accident and failed to immediately report the collision or exhibit his operator's license to the owner of the property, he was guilty of a misdemeanor. If Veiman had reported the accident, by telephone or otherwise, to the appropriate peace officer within 12 hours of the collision, he would have been guilty of a Class V misdemeanor. Whereas, if Veiman had not reported the collision within the first 12 hours, he would have been guilty of a Class IV misdemeanor.

While I may agree with the majority that § 39-6,104.02 was not a model of clarity as it existed on November 27, 1993, it was nonetheless the law at the time of Veiman's collision. Officer Craig was not mistaken as to the terms of § 39-6,104.02, and I would have affirmed Veiman's conviction for leaving the scene of a property damage accident.

WRIGHT and CONNOLLY, JJ., join in this dissent.