## STATE OF NEBRASKA, APPELLEE, V.
## JOHN M.C. ROBERTS, APPELLANT.

623 N.W. 2d 298

Filed March 16, 2001. No. S-00-325.

Arthur C. Toogood, Adams County Public Defender, for appellant.

Don Stenberg, Attorney General, and Susan J. Gustafson for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

HENDRY, C.J.

## INTRODUCTION

John M.C. Roberts was found guilty of possession of a controlled substance, a Class IV felony, and sentenced to 1 year's imprisonment in the county jail. Roberts appealed to the Nebraska Court of Appeals, which summarily affirmed the decision without opinion on August 31, 2000. Roberts then petitioned for further review, which this court granted.

## FACTUAL BACKGROUND

At approximately 4 a.m. on April 9, 1998, Randy Overton called the Adams County Sheriff's Department and requested that an officer come to the apartment where Overton was stay-

ing to remove Roberts. An argument had occurred between Overton and Roberts regarding which of them should be staying at the apartment. The apartment was located at 413 West Fourth Street, about one-half block from the Adams County sheriff's office in Hastings, Nebraska.

According to Roberts, his girl friend was the lessee of the apartment and she had given him a set of keys to the apartment. Apparently without informing Roberts, the lessee had in the meantime asked Overton to house-sit for 3 or 4 days while she was in the hospital and had also given Overton a set of keys. Overton had occupied the apartment for a day or two when Roberts came to the apartment on April 9, 1998, and discovered Overton was staying there.

In response to Overton's call, Officer James Konen, an Adams County deputy sheriff, walked to the residence. Having previously requested backup assistance, Officers Chad Wagner and Ed Garcia from the Hastings Police Department met Konen outside the apartment. The officers knocked on the apartment door, and Overton let them in. When the officers entered the apartment, Roberts and Overton were arguing over the apartment keys and Roberts' belongings.

Roberts asked Konen to accompany him to the bedroom where Roberts' property was located. Konen and Wagner went to the bedroom with Roberts, while Garcia remained with Overton. While in the bedroom, Konen and Wagner saw a pile of books and clothes lying on the bed. Roberts said he would leave if he could take the items on the bed with him and began gathering up the clothes and books and placing them in a bedsheet.

At this point, Wagner radioed the Hastings communications center to determine whether there were any outstanding warrants on either Overton or Roberts. Upon requesting such information, Wagner was advised there was an outstanding Adams County warrant for Roberts' arrest. Konen then informed Roberts that he was under arrest. Roberts asked Konen if he could put the items on the bed into a bedroom closet. Konen agreed, and Roberts tied the items in the sheet and placed them in the closet.

Konen then began to handcuff Roberts, whereupon Roberts asked if he could first remove his outer layer of clothing.

Roberts was wearing a pair of running pants and a nylon jacket over his blue jeans and shirt. Konen gave Roberts permission to remove the jacket and running pants. Roberts removed the pants and jacket and dropped them on top of the tied-up sheet. When Roberts dropped the items, Konen heard a "thud-type sound." As he was handcuffing Roberts, Konen asked Roberts what was in the clothes. Roberts said it was a cassette tape.

After handcuffing Roberts, Konen briefly patted him down. Roberts asked repeatedly if he could smoke a cigarette and if he could take his cigarettes with him. Konen said no. Almost immediately after Roberts was handcuffed, Overton began threatening Roberts. Both men began yelling at each other. Because the hostility was escalating, Konen removed Roberts from the apartment.

While Konen was escorting Roberts out, Wagner, who had been in the bedroom the entire time, searched the jacket Roberts had just removed because he thought it was suspicious that Roberts had asked to remove some of his clothing. In searching the jacket, Wagner found 30 to 40 tiny plastic baggies inside a larger plastic bag in the jacket pocket. After calling Garcia into the room, Wagner searched Roberts' running pants. In the pocket of the pants, Wagner found a marijuana pipe, a syringe, and what appeared to be an "eightball" of methamphetamine. The "eightball" was inside a package of cigarettes, inserted between the cellophane wrapper and the paper of the cigarette package. Wagner later testified that his search began "almost immediately" after Roberts was escorted from the bedroom, after "probably less than a minute" had elapsed.

The "eightball" later tested positive for amphetamine and methamphetamine, and Roberts was charged with possession of a controlled substance. Prior to trial, Roberts filed a motion to suppress the evidence found in his running pants and jacket. After a hearing, the court determined that the search of Roberts' pants and jacket was a valid search incident to a lawful arrest.

At trial, Overton testified that Roberts came to the apartment to remove his belongings. Overton testified that Roberts "was talking and all this and that." Overton

> wasn't in no mood to [sic] it, and that was it. I wanted him to get done and over with, and he was in the house so I said

I'll call the police officer if I have to. And he said go ahead and call the police officer, so I did.

Roberts testified that he came to the apartment simply to clean the apartment for his girl friend. Roberts testified that he left the jacket and running pants at the apartment prior to that evening and that before the officers arrived, he put on the jacket and running pants. He further asserted that the cigarette package, syringe, and methamphetamine were not his and that they must have been planted by Overton. Roberts testified on cross-examination that the marijuana pipe found in his running pants did belong to him. He also asserted that as far as he could remember, his cigarettes were with him when he was later booked into the Adams County jail.

Debra Campbell, a drug chemist employed by the State of Nebraska, testified at trial that the suspected "eightball" found in Roberts' running pants contained amphetamine and methamphetamine. Gary Hueske, another Adams County deputy sheriff, testified as a rebuttal witness for the State. Hueske testified that Roberts did not have any cigarettes with him when Hueske booked Roberts on April 9, 1998.

The jury found Roberts guilty of possession of a controlled substance. He was sentenced to 1 year's incarceration in the county jail. At sentencing, the court noted that Roberts was not an appropriate candidate for probation. Roberts had several prior offenses including theft, assault, and three drug infractions. Roberts appealed, and the Court of Appeals summarily affirmed his conviction and sentence. Roberts then petitioned for further review, which this court granted.

## ASSIGNMENTS OF ERROR

In his petition for further review, Roberts asserts the trial court erred in (1) denying his motion to suppress, (2) failing to grant a directed verdict, (3) denying his motion for new trial, (4) failing to place Roberts on probation, and (5) imposing an excessive and disproportionate sentence.

## STANDARD OF REVIEW

In reviewing a district court's ruling on a motion to suppress evidence obtained through a warrantless search or seizure, an appellate court conducts a de novo review of reasonable sus-

picion and probable cause determinations, and reviews factual findings for clear error, giving due weight to the inferences drawn from those facts by the trial judge. *State v. Ray,* 260 Neb. 868, 620 N.W.2d 83 (2000); *State v. Lara,* 258 Neb. 996, 607 N.W.2d 487 (2000).

■ When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Rieger,* 260 Neb. 519, 618 N.W.2d 619 (2000); *State v. Abbink,* 260 Neb. 211, 616 N.W.2d 8 (2000).

■ In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. *State v. Severin,* 250 Neb. 841, 553 N.W.2d 452 (1996); *State v. Dyer,* 245 Neb. 385, 513 N.W.2d 316 (1994).

■ In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Canbaz,* 259 Neb. 583, 611 N.W.2d 395 (2000); *State v. Clark,* 255 Neb. 1006, 588 N.W.2d 184 (1999).

■ Whether probation or incarceration is ordered is a choice within the discretion of the trial court, whose judgment denying probation will be upheld in the absence of an abuse of discretion. *State v. Wells,* 257 Neb. 332, 598 N.W.2d 30 (1999).

■ A jail term within the statutory limits will be upheld on appeal, absent an abuse of discretion. *State v. Lobato,* 259 Neb. 579, 611 N.W.2d 101 (2000).

## ANALYSIS
### MOTION TO SUPPRESS

■ Roberts asserts the trial court erred in overruling his motion to suppress because the methamphetamine found in the pocket of his running pants was seized in violation of his constitutional right to be free from unreasonable searches and seizures, guaranteed under the Fourth Amendment to the U.S.

Constitution and Neb. Const. art. I, § 7. These constitutional provisions do not protect citizens from all governmental intrusion, but only from unreasonable intrusions. *State v. Ortiz*, 257 Neb. 784, 600 N.W.2d 805 (1999).

Specifically, Roberts asserts that the search of his jacket and running pants was constitutionally unreasonable because Wagner, the officer who found the methamphetamine, was not the officer who actually arrested Roberts. Alternatively, Roberts contends that the search was unreasonable because Wagner did not have a search warrant or permission to search the clothing and was essentially conducting a "fishing expedition."

Roberts' first assertion is without merit. The three officers who responded to Overton's call for assistance jointly possessed the authority to conduct whatever search was constitutionally permitted under the circumstances. See, generally, *State v. Roach*, 234 Neb. 620, 452 N.W.2d 262 (1990); *State v. Staten*, 233 Neb. 800, 448 N.W.2d 152 (1989). When Konen requested assistance, Wagner and Garcia responded to the request and met Konen outside the apartment. The three officers entered the apartment together. Wagner told Konen there was an outstanding warrant for Roberts' arrest. Wagner and Konen were both present in the room when Roberts was placed under arrest. Although Konen was the officer who placed the handcuffs on Roberts, Wagner and Konen were both arresting officers at the scene. Compare *Connelly v. Department of Motor Vehicles*, 9 Neb. App. 708, 713-14, 618 N.W.2d 715, 720 (2000) (" '[a]n officer, who is present at the scene of the arrest for purposes of assisting in it, if necessary, is an "arresting officer" . . . even though a different officer actually places his hand upon the defendant and informs him that he is under arrest' "), quoting *State v. Stauffer*, 266 N.C. 358, 145 S.E.2d 917 (1966). Roberts' assertion that only Konen could perform the search incident to Roberts' arrest is without merit.

Roberts' second assertion rests on the fact that Wagner's search was made without a warrant. Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject only to a few " " " 'specifically established and well-delineated exceptions,' " ' " *State v. Craven*, 253 Neb. 601, 606, 571 N.W.2d 612, 617 (1997), which "must be strictly confined

by the exigencies which justify [their] initiation," *State v. Ortiz*, 257 Neb. at 815, 600 N.W.2d at 828. "In the case of a search and seizure conducted without a warrant, the State has the burden of showing the applicability of one or more of the exceptions to the warrant requirement." *State v. Craven*, 253 Neb. at 606, 571 N.W.2d at 617.

The warrantless search exceptions recognized by this court include: (1) searches undertaken with consent or with probable cause, see *State v. Lara*, 258 Neb. 996, 607 N.W.2d 487 (2000), and *In re Interest of Andre W.*, 256 Neb. 362, 590 N.W.2d 827 (1999); (2) searches under exigent circumstances, see *State v. Silvers*, 255 Neb. 702, 587 N.W.2d 325 (1998); (3) inventory searches, see *State v. Newman*, 250 Neb. 226, 548 N.W.2d 739 (1996); (4) searches of evidence in plain view, see *State v. Buckman*, 259 Neb. 924, 613 N.W.2d 463 (2000); and (5) searches incident to a valid arrest, see *State v. Ray*, 260 Neb. 868, 620 N.W.2d 83 (2000), and *State v. Roach, supra*. The State argues the trial court correctly found that Wagner's search of Roberts' jacket and running pants was a constitutionally permissible search under the fifth category, a search incident to a lawful arrest.

The validity of a search incident to a lawful arrest depends on the legality of the arrest itself. *State v. Ranson*, 245 Neb. 71, 511 N.W.2d 97 (1994). There is no factual dispute in this case that Roberts was lawfully arrested, based on the outstanding Adams County arrest warrant. This arrest provides the justification for the search. See, *State v. Ranson, supra*; *State v. Ray, supra*. Wagner's subjective reason for searching the clothing has no bearing on the legality of this search because the justification for the search rests on the fact that Roberts was arrested. Once a person is lawfully arrested, "if the search was within the scope of a search which may be conducted incident to a lawful arrest, then the evidence obtained from the search was properly admitted." *State v. Kimminau*, 240 Neb. 176, 181-82, 481 N.W.2d 183, 187 (1992).

Thus, the issue is whether the trial court erred in finding that a search of Roberts' jacket and pants fell within the permissible scope of a search incident to a lawful arrest. In *State v. Weible*, 211 Neb. 174, 179, 317 N.W.2d 920, 923 (1982), we

defined the permissible scope of a search incident to a lawful arrest, stating that "an arresting officer may search the arrestee's person to discover and remove weapons and to seize evidence to prevent its concealment or destruction, and may also search the area *within the arrestee's immediate control.*" Accord *Chimel v. California,* 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969). See, also, *State v. Sassen,* 240 Neb. 773, 484 N.W.2d 469 (1992); *State v. Staten,* 238 Neb. 13, 469 N.W.2d 112 (1991).

Roberts argues that the clothing was not within the area of his immediate control because the jacket and pants were searched after he was removed from the bedroom. Essentially, Roberts' argument is that his clothing was within the area of his immediate control only so long as Roberts remained in a position where he reasonably might gain access to the clothing.

In *Chimel v. California, supra,* the U.S. Supreme Court enunciated the scope of a search incident to an arrest. In *Chimel,* the officers lawfully arrested a suspect in his home on a charge of burglary, then conducted a warrantless search of the suspect's entire home. The Court concluded that the search of the entire home exceeded the reasonable scope of a search incident to a lawful arrest under the Fourth Amendment, and set out the following rule:

> There is ample justification . . . for a search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.
>
> There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas of the room itself.

395 U.S. at 763.

The *Chimel* Court went on to note that " '[t]he recurring questions of reasonableness of searches' depend upon 'the facts and circumstances—the total atmosphere of the case . . . viewed in the light of established Fourth Amendment principles.' " 395 U.S. at 765. However, the Court further noted that the justifica-

tion for a search incident to a lawful arrest is absent if " 'a search is remote in time or place from the arrest.' " 395 U.S. at 764, quoting *Preston v. United States*, 376 U.S. 364, 84 S. Ct. 881, 11 L. Ed. 2d 777 (1964).

In applying *Chimel*, the Eighth Circuit noted in *U.S. v. Morales*, 923 F.2d 621, 626 (8th Cir. 1991), that the meaning of the phrase " 'immediate control' " extends beyond the area that is easily accessible to an arrestee at the time of the search. In *Morales*, the arrestee was holding two bags when the officers approached and arrested him. After the arrest, the officers removed the bags about 3 feet away from the arrestee and searched them. The court concluded that "[r]egardless of whether the bags were easily accessible to Morales, they were within the area of 'immediate control' as defined by *Chimel*, [*New York v.*] *Belton*[, 453 U.S. 454, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981)], and the cases of this court." 923 F.2d at 627.

In *New York v. Belton, supra*, the officers searched the arrestee's jacket, which was located in the passenger compartment of an automobile. The Court found that the jacket was within the area of the arrestee's immediate control, although at the time of the search, the arrestee had already been removed from the automobile and placed under arrest.

We recognize that unlike *Belton*, Roberts' arrest took place in a home. However, in *State v. Roach*, 234 Neb. 620, 452 N.W.2d 262 (1990), we rejected the argument that the underlying rationale of *Belton* could be applied only during an automobile stop, noting that numerous decisions from various federal courts have applied *Belton* outside that context. See, e.g., *United States v. Fleming*, 677 F.2d 602 (7th Cir. 1982) (search of paper bag taken from arrestee during arrest valid under *Belton*, although search was conducted after arrestee was handcuffed and escorted outside home).

As explained by the Eighth Circuit:

[A]ccessibility, as a practical matter, is not the benchmark. The question is whether the [evidence] was in the area within the immediate control of the arrestee within the meaning of *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). This rule defines the area which may be searched, and is not constrained

because the arrestee is unlikely at the time of the arrest to actually reach into that area.

*United States v. Palumbo*, 735 F.2d 1095, 1097 (8th Cir. 1984) (search of area behind dresser drawer after arrestee was handcuffed valid). See, also, *U.S. v. Lucas*, 898 F.2d 606 (8th Cir. 1990) (search of kitchen cabinet after arrestee subdued and removed from area valid). Compare *Curd v. City Court of Judsonia, Ark.*, 141 F.3d 839 (8th Cir. 1998) (search of arrestee's purse after officers took possession of purse valid).

 Roberts asserts that once he left the bedroom, the area of his immediate control in effect vanished. The arrestee in *U.S. v. Nelson*, 102 F.3d 1344 (4th Cir. 1996), made a similar argument. In *Nelson*, the arrestee was placed under arrest in his home, and during the arrest, officers removed a bag from his shoulder. After the arrestee was handcuffed and escorted to another room in the house for questioning, the officers searched the shoulder bag. The Fourth Circuit held that the area of immediate control was not extinguished the moment the arrestee was handcuffed and removed, reasoning:

> While the need for the incident-to-arrest exception is indeed grounded on the need to protect law enforcement officers and evidence, the validity of such a search does not end at the instant the risks justifying the search come to an end. Even though the warrant exception is well grounded on the existence of exigent risks attending arrest, the pragmatic necessity of not invalidating such a search the instant the risks pass is well accepted.

*Id.* at 1347. Accord, *U.S. v. McLaughlin*, 170 F.3d 889 (9th Cir. 1999) (search of vehicle that commenced 5 minutes after defendant was arrested and removed from scene valid). See, also, *United States v. Silva*, 745 F.2d 840 (4th Cir. 1984) (search of arrestee's room valid although arrestee was handcuffed and guarded by agents); *Davis v. Robbs*, 794 F.2d 1129 (6th Cir. 1986) (search and seizure of rifle in house valid although arrestee was handcuffed and placed in squad car prior to search); *U.S. v. Queen*, 847 F.2d 346 (7th Cir. 1988) (search of closet after arrestee was handcuffed and guarded by two officers valid); *U.S. v. Lucas, supra*; *United States v. Roper*, 681 F.2d 1354 (11th Cir. 1982) (search of arrestee's shoulder bag lying on table valid

although arrestee was handcuffed); *United States v. Mason*, 523 F.2d 1122 (D.C. Cir. 1975) (search of closet while arrestee was handcuffed and standing 3 to 4 feet away from closet valid).

In the instant case, Roberts was wearing the clothing in question at the time of the arrest. The clothing was under his control when he intentionally removed it after being placed under arrest. The search itself took place in the same room where the arrest occurred. Considering the " 'total atmosphere' " of the facts and circumstances of this case, we determine that Roberts' jacket and running pants were within the area of Roberts' immediate control under *Chimel v. California*, 395 U.S. 752, 765, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969). To conclude otherwise would permit an arrestee to conceal evidence simply by discarding his or her clothing and leaving the area. See, e.g., *State v. Sassen*, 240 Neb. 773, 484 N.W.2d 469 (1992); *DeLong v. State*, 670 N.E.2d 56 (Ind. App. 1996); *State v. Vitale*, 795 S.W.2d 484 (Mo. App. 1990).

Having concluded that the search was properly within the area of Roberts' immediate control, we must also consider whether the search was timely. A search incident to arrest of the area within an arrestee's immediate control must be contemporaneous with the arrest. See, *Curd v. City Court of Judsonia, Ark.*, 141 F.3d 839 (8th Cir. 1998); *State v. Twohig*, 238 Neb. 92, 107, 469 N.W.2d 344, 354 (1991) (" 'search incident to a lawful arrest need not be made immediately on arrest' "); *State v. Roach*, 234 Neb. 620, 452 N.W.2d 262 (1990).

In *Curd*, police officers took the arrestee's purse from her when they arrested her at her home. About 15 minutes later, when the arrestee arrived at the police station, she requested that her purse be placed where she could see it. In response, an officer placed the purse in view and searched it. The Eighth Circuit held that this search incident to arrest was sufficiently contemporaneous to satisfy the Fourth Amendment. *Curd v. City Court of Judsonia, Ark., supra*. See, also, *New York v. Belton*, 453 U.S. 454, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981) (search of arrestee's jacket after placing him under arrest and searching his person contemporaneous); *United States v. Fleming*, 677 F.2d 602 (7th Cir. 1982) (search of paper bag 5 minutes after arrest contemporaneous).

The record in the instant case shows that Roberts removed his clothing, Konen handcuffed Roberts, then Konen escorted Roberts out of the bedroom because of escalating hostility between Roberts and Overton. Wagner initiated his search of the clothing "almost immediately" after Roberts was escorted from the bedroom, after "probably less than a minute" had elapsed. We find that the search of Roberts' removed clothing within minutes of his arrest was sufficiently contemporaneous to comport with the Fourth Amendment.

We determine that Wagner's search of Roberts' jacket and running pants satisfies the Fourth Amendment to the U.S. Constitution and Neb. Const. art. I, § 7. The search was within the area of Roberts' immediate control under *Chimel v. California, supra,* and was conducted contemporaneously with Roberts' arrest.

### REMAINING ASSIGNMENTS OF ERROR

In his second assignment of error, Roberts asserts the trial court erred in failing to grant a directed verdict in Roberts' favor made at the close of the State's case in chief and again at the conclusion of all the evidence. In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. *State v. Severin,* 250 Neb. 841, 553 N.W.2d 452 (1996); *State v. Dyer,* 245 Neb. 385, 513 N.W.2d 316 (1994).

Roberts contends the evidence adduced against him was doubtful and lacked any probative value because, according to Roberts' testimony, the cigarette package containing the "eight-ball" found by Wagner in Roberts' running pants was not his, but, instead, was planted by Overton. Roberts asserted that as far as he remembered, his package of cigarettes was in his possession when he arrived at the Adams County jail. However, Deputy Hueske testified that Roberts did not have any cigarettes with him when Roberts was booked into the jail. Roberts' testimony merely established a conflict in the evidence, which was resolved by the trier of fact against Roberts. The evidence in this case is not so doubtful in character or lacking in probative value

that a finding of guilt upon such evidence cannot be sustained. This assignment of error is without merit.

In his third assignment of error, Roberts asserts the trial court erred in denying his motion for new trial. However, Roberts does not argue this error in his brief. Errors that are assigned but not argued will not be addressed by an appellate court. *State v. Dixon*, 259 Neb. 976, 614 N.W.2d 288 (2000).

We have examined Roberts' remaining assignments of error under the appropriate standard of review and conclude they are without merit.

## CONCLUSION

We affirm the Court of Appeals' summary affirmance of the decision of the district court finding Roberts guilty of possession of a controlled substance and sentencing him to 1 year's imprisonment in the county jail.

AFFIRMED.