STATE OF NEBRASKA, APPELLEE, V.
CHRIS VOICHAHOSKE, APPELLANT.
709 N.W.2d 659

Filed February 10, 2006. No. S-05-132.

Bradley J. Montag, of Moyer, Moyer, Egley, Fullner & Montag, for appellant.

Jon Bruning, Attorney General, Matthew M. Enenbach, and Michael W. Jensen for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

Following a routine traffic stop, Trooper James D. Reilly of the Nebraska State Patrol detained the appellant, Chris Voichahoske. After a drug detection dog alerted to the car in which Voichahoske was a passenger, Voichahoske was taken to jail and strip searched by a deputy from a neighboring county. The deputy found a bag of methamphetamine protruding from Voichahoske's rectum. In a bench trial, the Boone County District Court convicted Voichahoske of possessing methamphetamine. Voichahoske appeals his conviction, claiming that the methamphetamine should have been suppressed because his detention and search were illegal and because the searching officer was outside his jurisdiction.

We affirm because (1) Reilly had reasonable suspicion to detain the car and its occupants for further investigation, (2) the detention was reasonable, (3) Reilly had probable cause particularized to Voichahoske that he was concealing drugs on his

person, and (4) the searching officer had jurisdiction under Neb. Rev. Stat. § 29-215(2)(c)(ii)(C) (Cum. Supp. 2004).

## I. BACKGROUND

Around 6:15 p.m. on February 17, 2004, Amy Roan was driving in Boone County, Nebraska, with passengers Voichahoske, Erin Young, and Michael Hall. Suspecting Roan was speeding, Reilly followed her. Before Reilly could turn on his patrol car lights, Roan pulled over into a farmyard. Having clocked her car traveling at 72 m.p.h. in a 60-m.p.h. zone, Reilly decided to conduct a traffic stop and followed them into the farmyard.

Reilly asked Roan for her driver's license, registration, and proof of insurance, and when she said she could not produce them, he asked her to follow him to his patrol car. Roan told Reilly that her name was "Christina Hohn" and that the car belonged to "her cousin, Amy Roan," who was in Iowa. Reilly was familiar with the Roan name, because several weeks earlier, a warrant had been issued for her arrest, and because law enforcement officers "suspected [Roan] of using illegal narcotics." He also asked her about her passengers and travel plans. She said that she did not know the two back seat passengers, but identified the front seat passenger as Voichahoske, who Reilly knew was also suspected of "using illegal narcotics."

According to Roan, she drove from Lindsay, Nebraska, to Albion, Nebraska, to pick up her cousin's child near a hospital; she planned to drop off the back seat passengers by some apartments near the hospital. When Reilly noted that she was not taking a direct route to Albion, she said that the back seat passengers had been looking at a vehicle near Saint Edward, Nebraska, when their ride left them. She also told Reilly that she pulled into the farmyard because it belonged to Voichahoske's relatives and that she needed to get gas money. Later, however, Voichahoske denied that he knew the owners of the farmyard, but he said the driver did.

Reilly then questioned the passengers, while Roan waited in his patrol car. Young was in the back seat on the passenger side, and Hall was in the back seat on the driver's side. Voichahoske told Reilly that they were going to Columbus to get gas money and then were heading back to Albion to drop off Young and

Hall. Hall said they planned to stay with a friend of his there, but could not say whose house he was staying at. Young said the friend lived in Columbus, and Hall corrected her, saying, " 'That's why we're staying in Albion.' "

Reilly also observed what he described as suspicious behavior. He said that while interviewing Roan in his patrol car, he noted that her passengers "continuously moved around" and that at one point, he saw Young lean forward, appearing to shove something under the passenger seat. When questioning the passengers, he noticed that Young appeared "unable to hold still." Young also complained that she had just started her menstrual cycle and "continuously rubbed her vaginal area," which made Reilly suspect that "she might be hiding something there." He suspected that she was on a narcotic.

Reilly then returned to his patrol car, gave Roan a speeding ticket, and asked permission to search Roan, her car, and its contents. When she refused, Reilly called for the Nebraska State Patrol canine unit. But when he learned that its drug dog was not available, he summoned the Nance County, Nebraska, canine unit instead. He told the dispatcher he believed that the Nance County canine unit was working that night and that he knew the Nebraska State Patrol trained the dog. He then told Roan she was being detained. While waiting for the canine unit, Roan explained to Reilly that "she was picking up her cousin's child at the hospital because it had bronchitis, and they were holding the child because they did not want it to get pneumonia." She also told Reilly she would consent to the search if that meant she would not have to wait for the drug dog; Reilly replied that he would wait for the dog to avoid the appearance of coercion.

About 12 minutes after detaining Roan, Sgt. Jeff D. Horn of the Nance County Sheriff's Department arrived. Reilly told Horn about the group's inconsistent stories, said that the stories did not make sense, and asked Horn to run his dog around the car to check for illegal narcotics. Horn asked Reilly to remove the passengers from the car first, but Reilly refused "in case they had narcotics on their person." Horn did as Reilly asked, and the dog alerted to both the passenger-side door and the driver's-side door. The passengers were then removed from the car and handcuffed.

After handcuffing them, Reilly asked Young and Hall for the driver's name. They said that they had just met the driver and that she had told them to say her name was Chrissy or Christina. Suspicious, Reilly questioned Voichahoske again about the driver's name. Voichahoske said that he had just met her that day and that her name was "Chrissy or something like that." Reilly then told Voichahoske that Roan reported earlier that she had known Voichahoske for almost a year. Voichahoske then admitted that Roan's driver's license was in his wallet. Reilly retrieved the license and confirmed that Roan had given him a false name.

Reilly then conducted a "very preliminary search of the vehicle" and asked the Norfolk, Nebraska, dispatcher to have Boone County send additional officers and a tow truck. Deputy Jaromey L. Radford and a Deputy Swanson responded to the dispatch. On arriving, Reilly and Horn informed them that the suspects' stories were "not making sense" and that the drug dog had alerted twice on the car. Reilly and Horn agreed that the occupants of the car needed to be searched, although this exchange was not evident on the videotape. They specifically asked Radford and Swanson to transport and search "the two remaining occupants . . . Hall and . . . Young." The videotape revealed no explicit reference to searching all the occupants, although Reilly did ask the dispatcher to explain "the situation" to the Boone County sheriff's office, to avoid surprise when the suspects arrived.

Before transporting Voichahoske, Horn patted him down and searched his pockets. During the pat-down search, Horn noticed a bulge in Voichahoske's left shoe; he and Reilly agreed that the bulge should be investigated. After the tow truck arrived, Horn and Reilly drove Voichahoske and Roan to the Boone County sheriff's office, dropping them off before taking Roan's car to a garage for processing. Reilly said he could not recall if he specifically gave the Boone County officers instructions to search Voichahoske and Roan, but "[i]t was known that they were to be searched."

Radford drove Hall to the Boone County sheriff's office. At the office, he and a Deputy Maple of Boone County strip searched Voichahoske. During the search, Voichahoske handed over a marijuana pipe hidden in his sock, and when Voichahoske was asked to bend over, the officers noted that a bag of white

powder was protruding from his rectum. The white powder was later identified as methamphetamine. In response to Radford's questioning, Voichahoske admitted that the bag was his and that he believed it contained methamphetamine.

After Reilly and Horn arrived at the garage, they searched Roan's car. Reilly found a clear plastic baggie containing methamphetamine lodged under the back of the front passenger seat between the foam and the springs; he also found a marijuana pipe and a small, blue container containing marijuana under the driver's seat. Horn found a small, brown bottle on the rear driver's side between the seat and the side paneling and a syringe on the floor of the car's hatchback. Horn testified that because of where Voichahoske was seated, Voichahoske did not have access to these items.

After searching the car, Reilly returned to the Boone County sheriff's office; he advised Voichahoske of his *Miranda* rights, and after Voichahoske waived his rights, Voichahoske told him he had picked up his methamphetamine in an old pickup near Fullerton, Nebraska, and that they were heading back to Albion to drop off Young and Hall when stopped. Voichahoske stated that he concealed his methamphetamine while Reilly questioned Roan in the patrol car and that he believed Young and Hall did the same.

The State charged Voichahoske with possessing a controlled substance, methamphetamine. After the Boone County District Court denied Voichahoske's motion to suppress, the court held a bench trial on stipulated facts, preserving Voichahoske's objections to the evidence. The court found Voichahoske guilty, sentencing him to 15 to 36 months' imprisonment.

## II. ASSIGNMENT OF ERROR

Voichahoske assigns, consolidated and rephrased, that the trial court erred by overruling his motion to suppress evidence stemming from his strip search, because his continued detention, arrest, and search were illegal and because the officer conducting the search was outside his primary jurisdiction.

## III. STANDARD OF REVIEW

When reviewing a district court's determinations of reasonable suspicion to conduct an investigatory stop and probable

cause to perform a warrantless search, ultimate determinations of reasonable suspicion and probable cause are reviewed de novo. But findings of historical fact to support that determination are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial court. See *State v. Verling*, 269 Neb. 610, 694 N.W.2d 632 (2005).

██ When an appeal calls for statutory interpretation or presents a question of law, an appellate court must reach an independent, correct conclusion irrespective of the determination made by the court below. *Caspers Constr. Co. v. Nebraska State Patrol*, 270 Neb. 205, 700 N.W.2d 587 (2005).

### IV. ANALYSIS

First, we address whether Reilly had reasonable suspicion to detain Roan while awaiting the drug dog; second, whether Reilly had probable cause to search and arrest Voichahoske; and third, whether Radford had authority to search Voichahoske in Boone County.

#### 1. CONTINUED DETENTION

Voichahoske argues that Reilly improperly detained Roan and her passengers. Resolving this issue hinges on whether Reilly had reasonable suspicion to believe that criminal activity was occurring.

██ Reilly stopped Roan because she was speeding; a traffic violation, no matter how minor, creates probable cause to stop the driver of a vehicle. *State v. Verling, supra; State v. Lee*, 265 Neb. 663, 658 N.W.2d 669 (2003). Once stopped, a law enforcement officer may conduct an investigation reasonably related in scope to the circumstances that justified the traffic stop. See *id.*

██ The investigation may include asking the driver for an operator's license and registration, requesting that the driver sit in the patrol car, and asking the driver about the purpose and destination of his or her travel. See *id.* Also, the officer may run a computer check to determine whether the vehicle involved in the stop has been stolen and whether there are outstanding warrants for any of its occupants. *Id.* The officer may engage in similar routine questioning of passengers in the vehicle to verify information provided by the driver. *State v. Verling, supra.*

 Here, the original purpose of the traffic stop was completed when Reilly issued the warning citation to Roan. See, *State v. Verling, supra*; *State v. Lee, supra*. In order to expand the scope of a traffic stop and continue to detain the person for additional investigation, an officer must have a reasonable, articulable suspicion that the person is involved in criminal activity beyond that which initially justified the interference. *Id.* Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized hunch, but less than the level of suspicion required for probable cause. See *State v. Verling, supra*. Whether a police officer has a reasonable suspicion based on sufficient articulable facts depends on the totality of the circumstances. See *id.* Reasonable suspicion must be determined on a case-by-case basis. *Id.* When a determination is made to detain a person during a traffic stop, even where each factor considered independently is consistent with innocent activities, those same factors may amount to reasonable suspicion when considered collectively. *Id.*

Before issuing the citation, Reilly had a reasonable, articulable suspicion that criminal activity was occurring. Several factors contribute to that suspicion; some might be insufficient standing alone, but collectively establish reasonable suspicion. First, Roan pulled into the farmyard after Reilly began following her, but before he turned on his lights; this made Reilly suspect that she sought to evade the stop. Also, when Reilly investigated the stop, Roan provided no proof of identification. See *U.S. v. Green*, 52 F.3d 194 (8th Cir. 1995) (determining that lack of identification does not automatically create reasonable suspicion of criminal activity, but that it can contribute).

Roan and her passengers also gave inconsistent explanations for pulling into the farmyard and inconsistent descriptions of their travel plans. See *State v. Lee*, 265 Neb. 663, 658 N.W.2d 669 (2003) (determining that individual's inconsistent explanation of reason for being at particular location can contribute to reasonable suspicion). See, also, *U.S. v. Johnson*, 58 F.3d 356 (8th Cir. 1995) (determining that inconsistencies between driver's and passenger's explanations of trip's purpose can contribute to reasonable suspicion). Reilly also testified that he was

suspicious because they were not taking the most direct route to their stated destination.

In addition, Reilly testified that Roan's passengers constantly moved around while he spoke with Roan in his patrol car; at one point, he saw Young lean forward and put something under the seat. See *State v. Gutierrez*, 9 Neb. App. 325, 611 N.W.2d 853 (2000) (determining that observing stopped passenger bend over and hide something can contribute to reasonable suspicion). He also noted that Young continuously rubbed her vaginal area while he questioned her and that she said she needed to use a restroom because she had just started her menstrual cycle. He opined that based on his experience and training, he believed her behavior indicated that she was on a narcotic and that she might be hiding contraband.

Reilly also stated that the Nebraska State Patrol's intelligence officer informed him Roan and Voichahoske were suspected of "using illegal narcotics." But Reilly provided vague information and could not explain what facts premised the suspicion. Moreover, Reilly did not realize Roan had given him a false name until after he detained her. Nonetheless, the totality of the circumstances demonstrates that Reilly had reasonable suspicion Roan was involved in illegal activity beyond that which justified the initial stop, and thus, he could detain her and the passengers while awaiting the drug dog.

Having determined that reasonable suspicion exists supporting continued detention, we consider whether the detention was reasonable in the context of an investigative stop. See *State v. Lee, supra*. We consider both the length of the continued detention and the investigative methods employed. See, *State v. Verling*, 269 Neb. 610, 694 N.W.2d 632 (2005); *State v. Lee, supra*. Reilly testified that the drug dog arrived about 15 minutes after ticketing Roan. Reilly called for the Nebraska State Patrol canine unit, but when it was not available, he had to wait for the Nance County canine unit, which he believed was both reliable and available. The record fails to show a lack of diligence on Reilly's part, or any unreasonable delay. And because a canine sniff is not a search under the Fourth Amendment, using the drug dog during the lawful detention did not violate any constitutionally protected right. See, *State v. Verling, supra*;

*State v. Lee, supra.* Thus, the length and method of detention were reasonable.

## 2. SEARCH AND ARREST

Voichahoske argues that the "trial court erred in overruling [his] Motion to Suppress Evidence . . . in that the arrest, detention and strip search of the appellant were without probable cause and therefore illegal." Brief for appellant at 15. We liberally interpret his assignment to raise two distinct issues: (1) whether strip searching Voichahoske was reasonable under the Fourth Amendment and (2) whether handcuffing Voichahoske triggered his *Miranda* rights.

### (a) Probable Cause to Search Voichahoske

The Fourth Amendment provides that the people are "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions, which must be strictly confined by their justifications. See *State v. Allen,* 269 Neb. 69, 690 N.W.2d 582 (2005).

The warrantless search exceptions recognized by this court include: (1) searches undertaken with consent or with probable cause, (2) searches under exigent circumstances, (3) inventory searches, (4) searches of evidence in plain view, and (5) searches incident to a valid arrest. *State v. Roberts,* 261 Neb. 403, 623 N.W.2d 298 (2001). In the case of a search and seizure conducted without a warrant, the State has the burden of showing the applicability of one or more of the exceptions to the warrant requirement. *State v. Roberts, supra.*

The State argues that the drug dog's alert while the passengers were inside the car provides probable cause to search both the car and its passengers. However, as explained later, this statement sweeps too broadly.

Probable cause escapes precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. *Maryland v.*

*Pringle*, 540 U.S. 366, 124 S. Ct. 795, 157 L. Ed. 2d 769 (2003). See, also, *State v. Oltjenbruns*, 187 Neb. 694, 193 N.W.2d 744 (1972). Moreover, we determine probable cause by an objective standard of reasonableness: whether the known facts and circumstances are sufficient to warrant a person of reasonable prudence in the belief that contraband or evidence of crime will be found. See *State v. Craven*, 253 Neb. 601, 571 N.W.2d 612 (1997). Here, Reilly had probable cause to search the *car* because of the dog's alert. A dog's identification of drugs in luggage or in a car provides probable cause that drugs are present. *U.S. v. Bloomfield*, 40 F.3d 910 (8th Cir. 1994).

 But a person's mere proximity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. See *Ybarra v. Illinois*, 444 U.S. 85, 100 S. Ct. 338, 62 L. Ed. 238 (1979) (holding that search warrant for tavern and its bartender did not permit body searches of all bar's patrons). Specifically, probable cause to search a car does not necessarily justify searching the body of a passenger. *United States v. Di Re*, 332 U.S. 581, 68 S. Ct. 222, 92 L. Ed. 210 (1948).

"Even a limited search of the outer clothing . . . constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." *Terry v. Ohio*, 392 U.S. 1, 24 25, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Thus,

> [w]here the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.

*Ybarra v. Illinois*, 444 U.S. at 91.

We have echoed this standard, saying: "Probable cause to arrest is not some vapor permeating a place, engulfing anyone who happens to be at a site where unlawful conduct may be occurring or may have occurred. Rather, probable cause to arrest is particularized and exists in reference to a specific individual." *State v. Evans*, 223 Neb. 383, 388, 389 N.W.2d 777, 781 (1986).

So we focus on whether Reilly had probable cause sufficiently particularized to Voichahoske.

In *Maryland v. Pringle*, the U.S. Supreme Court considered whether there was probable cause particularized to the defendant, the front seat passenger, when (1) $763 of rolled-up cash was found in the glove box directly in front of him, (2) five plastic baggies of cocaine were hidden within his reach, and (3) all of the car's occupants refused to claim ownership of the money and cocaine. The Court reasoned:

> We think it an entirely reasonable inference from these facts that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine. Thus a reasonable officer could conclude that there was probable cause to believe [the defendant] committed the crime of possession of cocaine, either solely or jointly.

*Maryland v. Pringle*, 540 U.S. 366, 372, 124 S. Ct. 795, 157 L. Ed. 2d 769 (2003). The Court also brushed aside the defendant's attempt to characterize the case as one of "guilt-by-association." *Id.* It distinguished *Ybarra* and *Di Re*, pointing out that in *Pringle*, the evidence showed a " 'common enterprise' " among the car's occupants, producing " 'the same interest in concealing the fruits or the evidence of their wrongdoing.' " *Maryland v. Pringle*, 540 U.S. at 373 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 119 S. Ct. 1297, 143 L. Ed. 2d 408 (1999)). The Court stated that the evidence indicated that someone in the car was dealing drugs. This was significant because the Court reasoned that drug dealing is an enterprise not likely to be conducted in front of innocent persons who could testify against those involved. *Maryland v. Pringle, supra.*

Voichahoske, however, argues that the State failed to establish probable cause for his arrest, detention, and strip search because no contraband was linked to him until after the strip search. Voichahoske's argument fails. Like the baggies in *Pringle*, the dog's alert provided probable cause to believe that someone in the car possessed drugs. Also like *Pringle*, Voichahoske is not guilty by association. He actively helped Roan conceal her identity by hiding her driver's license in his wallet and lying to Reilly about her identity. This complicity suggests a common enterprise with the same interest in concealing the evidence of wrongdoing.

Moreover, the officers found no drugs during their preliminary search of the car, despite the drug dog's alert, and the passengers had ample time to conceal evidence. We determine Reilly had probable cause to believe that drugs would be found on Voichahoske.

### (b) *Miranda*

Voichahoske argues that he was not informed of his *Miranda* rights until after the strip search. The State responds by arguing that Voichahoske was merely detained for investigation during the strip search and was not formally arrested until after Reilly searched the car. We disagree with the State's contention that Voichahoske was not in custody.

Under the *Miranda* rule, a "custodial interrogation" takes place when questioning is initiated by law enforcement officers after one has been taken into custody or is otherwise deprived of one's freedom of action in any significant way. See *State v. Veiman*, 249 Neb. 875, 881, 546 N.W.2d 785, 790 (1996). Here, Voichahoske was handcuffed for almost 1½ hours before arriving at the station. And during the strip search, Radford asked Voichahoske if the baggie of white powder was his and if he knew what it was. In response, Voichahoske claimed ownership and admitted it was methamphetamine. Laboratory testing later confirmed that it was methamphetamine. But any error is harmless because the information obtained was cumulative to that legitimately obtained by the search. See *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349 (1992).

### 3. RADFORD'S JURISDICTION TO SEARCH VOICHAHOSKE

Voichahoske argues that Radford illegally searched him because Radford was outside his primary jurisdiction when conducting the search and thus had no authority to act. Section 29-215 defines the jurisdiction and powers of law enforcement officers. The pertinent portions of § 29-215 provide:

> (1) A law enforcement officer has the power and authority to enforce the laws of this state and of the political subdivision which employs the law enforcement officer or otherwise perform the functions of that office anywhere within his or her primary jurisdiction.

*(2) Any law enforcement officer who is within this state, but beyond his or her primary jurisdiction, has the power and authority to enforce the laws of this state . . . or otherwise perform the functions of his or her office, including the authority to arrest and detain suspects, as if enforcing the laws or performing the functions within his or her primary jurisdiction in the following cases:*

. . . .

*(c) Any such law enforcement officer shall have such enforcement and arrest and detention authority when responding to a call in which a local, state, or federal law enforcement officer is in need of assistance. A law enforcement officer in need of assistance shall mean (i) a law enforcement officer whose life is in danger or (ii) a law enforcement officer who needs assistance in making an arrest and the suspect* (A) will not be apprehended unless immediately arrested, (B) may cause injury to himself or herself or others or damage to property unless immediately arrested, or *(C) may destroy or conceal evidence of the commission of a crime*; and

. . . .

(4) For purposes of this section:

. . . .

(b) Primary jurisdiction means the geographic area within the territorial limits of the state or political subdivision which employs the law enforcement officer.

(Emphasis supplied.)

Voichahoske argues first that Radford lacked jurisdiction under § 29-215(2) because "Reilly never told . . . Radford that Voichahoske needed to be searched or they would lose evidence." Brief for appellant at 13. The trial court found that "[a]s contended by the defendant, it does not appear that any of these factors [under § 29-215(2)(c)] are applicable to the facts at hand." Voichahoske's argument initially appears to have traction, but bogs down under further scrutiny.

Voichahoske argues that "Radford testified that . . . Reilly never advised that he was concerned about losing evidence[;] Reilly never told . . . Radford that Voichahoske needed to be searched or they would lose evidence." Brief for appellant

at 13. Voichahoske essentially argues that Reilly never explicitly told Radford that he was concerned that evidence would be lost. But § 29-215(2)(c)(ii)(C) does not call for such specificity. Subsection (2)(c)(ii)(C) does not require that an officer requesting assistance tell the responding officer that he or she fears evidence will be lost. It asks (1) whether the suspect "may destroy *or conceal* evidence of the commission of a crime," § 29-215(2)(c)(ii)(C), and (2) whether an officer "needs assistance in making an arrest," § 29-215(2)(c)(ii). The statute fails to specify whether these questions are answered subjectively — what the requesting officer believed, or objectively — what a reasonable person under the circumstances could believe. But we need not decide this because both standards are met.

### (a) Possibility of Destroying or Concealing Evidence

Although Reilly never explicitly told Radford he was concerned about "losing evidence," he did testify that he believed that "anybody in the vehicle could possibly have had narcotics on them." He also asked Horn to pat down Voichahoske at the scene, and in his police report, he described it as a search "for narcotics." Moreover, Reilly testified that he agreed with Horn that the occupants needed to be searched and the videotape reveals that Reilly agreed that the bulge in Voichahoske's shoe needed to be investigated.

Why would Reilly want the occupants searched if not to find concealed evidence? Reilly testified that when he called the dispatcher for assistance, the occupants had already been handcuffed. And the record provides no indication that the occupants threatened his safety. Moreover, if Reilly had not been concerned that the occupants would discard evidence, he and Horn could have driven the four, two to a car. Instead, he opted to wait for separate transportation, so the suspects could not leave contraband in the patrol car and possibly blame their fellow passengers.

Reilly also had an objective reason to believe that Voichahoske was concealing evidence and that given the opportunity, he might destroy it. Reilly already had probable cause to believe Voichahoske was concealing drugs on his person, which, in turn, justified his arrest. See *State v. Dussault*, 193

Neb. 122, 225 N.W.2d 558 (1975) (holding that under Fourth Amendment, standards for determining probable cause for arrest and probable cause for search and seizure are same). Because a search of his person was inevitable, Reilly could reasonably believe Voichahoske would seize the opportunity to destroy or discard the drugs. Thus, the record shows both subjectively and objectively that Voichahoske might conceal or destroy evidence.

(b) Assistance Making Arrest

When probable cause materialized, Reilly was the only officer at the scene with primary jurisdiction. Although the occupants were handcuffed, he had to drive all four of them to the Boone County jail for further processing, search them incident to arrest, and search the car. The occupants outnumbered Reilly, and he could not accomplish all four arrests by himself. Recognizing this, he called his dispatcher to request help. Nance County deputies Radford and Swanson responded to the call. Each of the four officers drove one of the occupants. Swanson drove Voichahoske to the station. Then Radford and Maple, a Boone County deputy, searched Voichahoske, while Reilly and Horn searched the car. To require Reilly to drive each occupant to the station while the Nance County deputies detained the others would be senseless. Although Reilly could have refused assistance from the Nance County deputies and waited for Boone County deputies to arrive, this could pose an unreasonable delay. Moreover, because he requested assistance from Boone County officers but was told that Nance County officers were responding, Reilly could reasonably believe that the Boone County officers could not respond in time. A reasonable person could believe that help was needed to carry out the arrests.

██ Because Voichahoske might conceal or destroy evidence, and because Reilly needed assistance in making the arrest, we determine that Reilly was "in need of assistance" within the meaning of § 29-215(2)(c). Although Voichahoske argues that Reilly did not explicitly ask for assistance in searching Voichahoske, as before, we do not read the statute as requiring such specificity. Under § 29-215(2)(c), officers responding to requests for assistance outside their jurisdiction have the same authority as they would in their primary jurisdiction. Compare

§ 29-215(1) and (2). It is undisputed that Reilly requested assistance and that Radford responded to that call. Thus, Radford has the same authority in Boone County as he would in Nance County. Because he could have searched Voichahoske incident to arrest in Nance County, it follows that he could also search him incident to arrest in Boone County. Therefore, Radford had authority to administer the strip search under § 29-215.

Voichahoske, however, argues that Maple, as a Boone County deputy, could have conducted the search instead of Radford. The record reflects that both Maple and Radford were in the booking room with Voichahoske during the search, but that Radford told Voichahoske to disrobe. Although Maple could have conducted the search, he had not been at the scene and did not have the details of the stop and arrest. While ideally, Reilly should have conducted the search incident to arrest, it was permissible for Radford to conduct the search under these circumstances.

## V. CONCLUSION

Reilly had reasonable suspicion that a crime was occurring. He was thus justified in detaining Roan and her passengers for further, limited investigation. Moreover, the manner and duration of the detention was reasonable. The drug dog's alert, in combination with Voichahoske's complicity hiding Roan's identity, provided probable cause particularized to Voichahoske that he was concealing drugs on his person. Thus, his arrest, detention, and subsequent search were reasonable under the Fourth Amendment. Finally, because of the risk that he was concealing evidence and might destroy it, and because of Reilly's request for assistance making the arrest, Radford was authorized to search Voichahoske incident to his arrest. Voichahoske's conviction is affirmed.

AFFIRMED.