IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. GUZMAN


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

TAMARA A. GUZMAN, APPELLANT.


Filed November 1, 2022.    No. A-22-105.


Appeal from the District Court for Platte County: JAMES C. STECKER, Judge. Affirmed.

Jessica S. Fauss, Deputy Platte County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Matthew Lewis for appellee.


PIRTLE, Chief Judge, and ARTERBURN and WELCH, Judges.

PIRTLE, Chief Judge.

## INTRODUCTION

Tamara A. Guzman appeals her conviction in the district court for Platte County for possession of a controlled substance, arguing that her motion to suppress should have been granted because the police officer did not have reasonable suspicion to further detain her in order to conduct a canine sniff of the vehicle after a traffic stop had been completed. Based on the reasons that follow, we affirm.

## BACKGROUND

Guzman was charged with possession of a controlled substance. She filed a motion to suppress the evidence obtained as a result of the search of her vehicle. The motion alleged that the continued seizure and search of her vehicle following the issuance of a warning citation was done without probable cause or reasonable suspicion that a violation of law had occurred, was occurring, or was about to occur. A hearing was held on her motion.

The evidence at the hearing showed that at 12:19 a.m. on April 4, 2021, Officer Santiago Velasquez of the Columbus Police Department observed a blue Toyota Avalon traveling without its headlights on. The vehicle also did not have license plates. Velasquez, a police officer since 2013, a K-9 handler, and a certified drug recognition expert, initiated a traffic stop. He made contact with the driver, Brian Brown, who indicated he had no identification on him. The passenger in the vehicle also indicated she had no identification but said her name was Tamara. She was subsequently identified as the defendant, and the owner of the vehicle. Velasquez asked Brown for the vehicle's registration and insurance and Guzman reached into the glove box and retrieved an envelope that contained information for the vehicle. While at the vehicle, Velasquez noticed a strong odor of a sweet fragrance. He testified that based on his training and experience, such fragrances are commonly used to mask the odor of controlled substances and alcohol.

Velasquez observed Guzman's pupils to be dilated, and testified her movements were "rigid" when retrieving the envelope from the vehicle's glovebox. Velasquez's observations led him to suspect Guzman was under the influence of alcohol or a controlled substance. Velasquez testified that as a drug recognition expert, he was trained to recognize when an individual is under the influence of a controlled substance.

Velasquez asked Brown to exit the vehicle and sit in his patrol car. Velasquez testified that while Brown was in the patrol car he was overly nervous, soft-spoken, and avoided eye contact. Brown stated that he and Guzman both lived in Grand Island and had known each other for a couple years. Upon inquiry, Brown indicated he and Guzman had traveled to Columbus to play "skill games" or "gaming machines" at various bars. Velasquez thought Brown's reason for traveling to Columbus was odd because the same or similar skill games/gaming machines could be found in Grand Island. Velasquez also testified that Brown's reason for coming from Grand Island to Columbus raised his suspicion that he was involved in criminal activity because Grand Island is a major hub in Nebraska for drug distribution. Velasquez testified that Brown was nervous throughout his contact with him.

Velasquez confirmed the identities of Brown and Guzman and ran a records check which revealed Guzman had prior drug-related convictions. Velasquez also confirmed ownership of the vehicle and checked whether it was properly insured. He then determined he would issue Brown a warning citation and started to fill it out. At that time another police officer arrived who took over the process of issuing Brown the warning citation, and Velasquez returned to the vehicle to speak with Guzman.

Velasquez again observed the pupils of Guzman's eyes to be dilated. He shined a flashlight into her eyes, a common practice he learned through the drug recognition expert program, and her eyes had little reaction to light. Velasquez testified that because of her dilated pupils and the fact that he detected no odor of alcohol, he suspected Guzman may be under the influence of a stimulant.

Velasquez testified that Guzman told him she lived in Central City and came to Columbus to visit her grandmother. Guzman's stated reason for being in Columbus raised Velasquez's suspicion further because it was inconsistent with the reason provided by Brown. Brown specifically said he and Guzman came to Columbus to play skill games/gaming machines and did not say anything about Guzman's grandmother. Guzman denied that there were any drugs inside

the vehicle and she denied consent to search the vehicle. Velasquez testified that Guzman became defensive when he asked her about drugs inside the vehicle.

While Velasquez was still speaking with Guzman, Brown returned to the vehicle and asked if he could leave. At that point, Velasquez felt he had a reasonable suspicion that Brown and Guzman were involved in drug-related criminal activity and informed them that they were being detained. Velasquez asked Guzman to step out of the vehicle and explained to her that he was going to deploy his drug dog to do a sniff around the vehicle. Guzman was compliant and also consented to a search of her person.

Velasquez deployed his drug dog, who was in his patrol vehicle, and after circling Guzman's vehicle the canine alerted and indicated a presence of drugs. Velasquez conducted a search of the vehicle and located a box on the floor of the front passenger side of the vehicle containing a suspected controlled substance and items of drug paraphernalia. A pipe from the box was field tested and tested positive for methamphetamine. Guzman was placed under arrest.

Guzman testified that on April 3, 2021, she had visited her grandmother, who lived in Central City, before going to Columbus. She stated she did not remember what she told Velasquez but would not have told him that her grandmother lived in Columbus. Guzman also offered into evidence Velasquez's in-car camera recording of the encounter and it was received into evidence.

Following the hearing, the motion to suppress was overruled. A stipulated bench trial followed. Guzman renewed her motion to suppress, which the court overruled. The trial court found Guzman guilty of possession of a controlled substance. It sentenced her to a 3-year term of supervised probation.

## ASSIGNMENT OF ERROR

Guzman assigns that the trial court erred in overruling her motion to suppress illegally obtained evidence.

## STANDARD OF REVIEW

When reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Barbeau*, 301 Neb. 293, 917 N.W.2d 913 (2018). Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *Id.*

## ANALYSIS

Guzman assigns that the trial court erred in overruling her motion to suppress illegally obtained evidence. She argues that Velasquez did not have reasonable suspicion to further detain her after the traffic stop ended for the purpose of conducting a canine sniff, and the evidence obtained as a result should be inadmissible.

We first note that Guzman acknowledges that the initial stop of her vehicle was legal. We agree. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. *Id.* A traffic violation, no matter how minor, creates probable cause to stop the driver of a vehicle. *Id.* Velasquez initiated a stop of

Guzman's vehicle because it did not have license plates and did not have headlights on at 12:19 a.m. The fact that a traffic violation took place is not challenged on appeal, and thus, the initial stop of Guzman's vehicle was justified.

Guzman argues that Velasquez impermissibly detained her after the traffic stop ended because he did not have reasonable suspicion that she was involved in criminal activity. The original purpose of the traffic stop was completed when Velasquez issued the warning citation to Brown. See *State v. Voichahoske*, 271 Neb. 64, 709 N.W.2d 659 (2006). To expand the scope of a traffic stop and continue to detain the motorist, an officer must have a reasonable, articulable suspicion that a person in the vehicle is involved in criminal activity beyond that which initially justified the interference. *State v. Khalil*, 25 Neb. App. 449, 908 N.W.2d 97 (2018). Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized hunch, but less than the level of suspicion required for probable cause. *Id*. Whether a police officer has a reasonable suspicion based on sufficient articulable facts depends on the totality of the circumstances. *Id.* Reasonable suspicion exists on a case-by-case basis. *Id.* Factors that would independently be consistent with innocent activities may nonetheless amount to reasonable suspicion when considered collectively. *Id*. An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered. *Id.*

In this case, Velasquez suspected there was criminal activity occurring based on multiple factors. After being stopped, neither Brown nor Guzman had identification on them. Velasquez observed a strong odor of a sweet fragrance coming from Guzman's vehicle. Based on his training and experience, such fragrances are commonly used to mask the odor of controlled substances and alcohol.

Brown was very nervous throughout his contact with Velasquez, spoke softly, and avoided eye contact. Brown told Velasquez he and Guzman had traveled from Grand Island to Columbus to play skill games at various bars. Velasquez thought this was odd because the same or similar skill games in Columbus bars could also be found in Grand Island. Velasquez also testified that Grand Island is a drug distribution hub in Nebraska.

Guzman told Velasquez she was in Columbus to see her grandmother. Velasquez testified that Guzman's stated purpose for being in Columbus was inconsistent with or did not match that provided by Brown, further raising his suspicions. Even if Brown's and Guzman's accounts of why they were in Columbus were not inconsistent, it was reasonable for Velasquez to question why Brown did not mention visiting Guzman's grandmother.

When Velasquez first had contact with Guzman he suspected that she was under the influence of alcohol or a controlled substance. He noted that her pupils were dilated and her hand movements were rigid. Velasquez is a trained drug recognition expert, trained to recognize when an individual is under the influence of a controlled substance.

When Velasquez went back to the vehicle to talk with Guzman after the other officer arrived, he again noted her pupils were dilated. When asked about the presence of drugs inside the vehicle, Guzman became defensive. Based on his experience and training as a drug recognition expert, and the fact he could not detect the odor of alcohol, Velasquez suspected Guzman was under the influence of a stimulant. Velasquez had also discovered Guzman had prior drug-related convictions.

Given the totality of the circumstances, Velasquez had a reasonable suspicion to expand the scope of the traffic stop and continue to detain Guzman in order to perform a canine sniff of the vehicle. After the canine alerted, the continued detention for the purpose of searching the vehicle was constitutionally permissible.

Having determined that reasonable suspicion existed supporting continued detention, we consider whether the detention was reasonable in the context of an investigative stop. See *State v. Voichahoske*, 271 Neb. 64, 709 N.W.2d 659 (2006). We consider both the length of the continued detention and the investigative methods employed. *Id.* Velasquez had the drug dog with him in his vehicle and approximately only four minutes elapsed between the time Brown was issued the warning ticket and the drug dog alerted to the presence of drugs in the vehicle. The record fails to show a lack of diligence on Velasquez's part, or any unreasonable delay. And because a canine sniff is not a search under the Fourth Amendment, using the drug dog during the lawful detention did not violate any constitutionally protected right. *Id.* Thus, the length and method of detentions were reasonable. We conclude that the trial court properly overruled Guzman's motion to suppress evidence.

## CONCLUSION

For the reasons discussed above, the trial court did not err in overruling Guzman's motion to suppress. We therefore affirm her conviction and sentence.

AFFIRMED.